Margaret L. HITCHCOCK

and

Wilbur W. Hitchcock

v.

UNITED STATES.

Civ. A. No. 1138–77.

United States District Court,
District of Columbia.

July 27, 1979.

M. Elise Haldane, Robert C. Liotta, Washington, D. C., for plaintiffs.

Stephen S. Cowen, Asst. U. S. Atty., W. Russell Welsh, Atty. U. S. Dept. of Justice, Civil Division, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

OBERDORFER, District Judge.

I. *Findings of Fact*[1]

1. Wilbur Hitchcock has served as an officer in the Foreign Service of the De-

---

1. The Court prepared the Findings of Fact in this case without the benefit of a Court Report-er's transcript of the trial. In this case, neither party ordered a transcript. Under existing law,

partment of State ("the Department") since 1954. Mr. Hitchcock has been married to his wife, Margaret, for 35 years. Mrs. Hitchcock has accompanied Mr. Hitchcock on all of his overseas assignments with the Foreign Service. Prior to his present assignment in Buenos Aires, Argentina, Mr. Hitchcock was stationed in Quebec, Canada, where he was accompanied by his wife.

2. In 1972 Mr. Hitchcock was assigned to the United States Consulate in Buenos Aires, Argentina by the Department as Deputy Chief of Mission. Mrs. Hitchcock planned to accompany him to Buenos Aires and to perform the public functions expected of a Foreign Service Officer's wife by the Department. At the time, the wives of Foreign Service Officers were expected to contribute to their husbands' careers.

(Testimony of Mr. and Mrs. Hitchcock.)

3. In May and June, 1972, Mr. and Mrs. Hitchcock reported to the Foreign Service Institute in Rosslyn, Virginia, to receive a series of inoculations required or recommended by the Department for Foreign Service personnel assigned to Buenos Aires, Argentina. The Foreign Service Institute is a facility operated for and by the Department.

4. In May and June, 1972, the Department routinely administered duck embryo-derived antirabies vaccine ("DEV") as pre-exposure prophylaxis for Foreign Service personnel assigned to Buenos Aires, Argentina, and to other particular stations. The DEV was routinely administered by a nurse, with no physician present.

(Testimony of Mr. and Mrs. Hitchcock and Dr. Martin Wolfe, Department of State Office of Medical Services.)

5. The DEV pre-exposure prophylaxis administered at the Foreign Service Institute to Mr. and Mrs. Hitchcock consisted of two injections of DEV (one cc. per injection) with an interval of approximately one month between injections. A third injection or "booster" was to be given six or seven months later. This fact was noted on Mrs. Hitchcock's immunization record (Plaintiffs' exhibit 13).

Mrs. Hitchcock received the first injection of DEV on May 17, 1972; she received the second injection of DEV on June 13, 1972. Mrs. Hitchcock did not receive a third "booster" injection.

Mrs. Hitchcock was not tested shortly after her vaccination to determine whether the DEV in her system had been effective in producing rabies antibody. Such a test is called an "antibody titer." Mrs. Hitchcock's first antibody titer was taken in 1975 by a private physician. See pp. 72–73, infra.

(Testimony of Mr. and Mrs. Hitchcock; Plaintiffs' exhibits 13 and 59(c); Defendant's exhibit 8.)

6. On neither occasion of Mrs. Hitchcock's vaccinations with DEV did the Department, the Foreign Service Institute, or their agents inform her of the probability and degree of harm attendant upon vaccination with DEV or of the possible benefits to be derived from such vaccination. A nurse employed by the Foreign Service Institute in 1972, Nurse Martha Richioppi, testified that although she did not know what information was provided Mr. and Mrs. Hitchcock at the time they were given the DEV, it was standard procedure to give patients receiving DEV no information regarding the incidence and severity of possi-

Reporters are compensated in part by a salary, 28 U.S.C. § 753(e) (Supp.1979), and in part by fees for furnishing transcripts to the parties. See 28 U.S.C. § 753(f) (Supp.1979). The Reporter would therefore have received no compensation (beyond salary) for preparing and furnishing a trial transcript to the Court. *Texas City Tort Claims v. United States*, 188 F.2d 900 (5th Cir., 1951). The Court is advised that for this reason Court Reporters are reluctant to furnish trial transcripts not ordered by a party, and that it has not been the practice of Courts generally to require Reporters to do so. Although preparation of Findings without a transcript was a serious handicap in this complex case, this Court was reluctant to order an individual Reporter to incur financial burdens not imposed in practice upon Reporters generally.

The Court suggests that the system which has induced this impasse deserves the attention of the Judicial Conference and the appropriate Committees of Congress.

ble side-effects nor the potential benefits to be gained from taking DEV as pre-exposure rabies prophylaxis. It was routine, however, to inquire whether the patient had any allergies and to invite the patient to wait twenty minutes after the vaccination to observe any allergic reactions. Neither Mr. or Mrs. Hitchcock recalls that such a procedure was used with them and there was no direct proof adduced to the effect that such a procedure was used in their case.

There was also no evidence that personnel administering the DEV to Mr. and Mrs. Hitchcock disclosed that the manufacturer of DEV recommended that each inoculee obtain an antibody titer soon after vaccination to determine the effectiveness of the vaccination. See pp. 72–73, infra. Defendant adduced no evidence to establish that the Department itself provided for the taking of rabies antibody titers.

(Testimony of Mr. and Mrs. Hitchcock and Nurse Martha Richioppi).

7. After the first injection with DEV in May, 1972, Mrs. Hitchcock noted a "tiredness" and "heaviness" in her legs. After the second injection with DEV in June, 1972, she again noticed that her legs felt tired and heavy; she also noticed that she was having difficulty getting up and down stairs. Mrs. Hitchcock began experiencing numbness in her hands in February, 1973; by May, 1973, her legs and waist were numb; the feelings of tiredness progressed. By December, 1974, Mrs. Hitchcock could walk only slowly and with some difficulty. In an undated report of her medical history through February, 1974, she wrote that without special padding in her shoes, "I feel as if my bones are coming through my feet." Defendants' exhibit 8. Mrs. Hitchcock's symptoms progressed, and by May, 1978, she was confined to a wheelchair. At present, Mrs. Hitchcock can stand for about five minutes and only with assistance. She is no longer able to perform the functions of a Foreign Service Officer's wife. She suffers from a progressive demyelinating disease,[2] which has caused paralysis, pain, numbness, limitation of physical movement, mental anguish, inability to work or to do housework, and loss of enjoyment of life. She is permanently and totally disabled.

Mr. Hitchcock suffered no similar effects after the DEV injections.

(Testimony of Mr. and Mrs. Hitchcock and Dr. Ernesto Herskovits, an expert neurologist and Mrs. Hitchcock's treating physician since 1974; Plaintiff's exhibits 3 and 4; Defendant's exhibits 8, 9, 35 and 36.)

8. Prior to the DEV injections in May and June, 1972, Mrs. Hitchcock was a relatively healthy, fifty-one year old woman. (Testimony of Margaret Hitchcock; Defendants' exhibits 5, 6, 7 and 8.)

9. On November 2, 1954, Mrs. Hitchcock was examined by an opthalmologist for a complaint of blurred vision in her right eye. Examination at that time revealed central serous retinitis. The blur later cleared slightly but vision was not as bright in the right eye as in the left eye. (Defendant's exhibit 32.)

10. The symptoms of serous retinitis are identical to those of optic neuritis. It has only been in recent years, with the invention of the indirect opthalmoscope and fluroscein angiography, that the two conditions can be distinguished. Those techniques were not available in 1954 and were not performed on Mrs. Hitchcock at that time. Optic neuritis is a very common early symptom of multiple sclerosis. (Defendant's exhibits 32 and 35; Plaintiffs' exhibit 4.)

11. A visual evoked response test was administered to Mrs. Hitchcock in 1979. The findings of this test are highly suggestive of an optic nerve dysfunction of the demyelinating type. A localized retina problem, such as central serous retinopathy, should not affect the visual evoked response. Although multiple sclerosis frequently involves the optic nerve, a demyelinating disease that is not multiple sclerosis could also involve dysfunction of the optic

2. A demyelinating disease is a disease which destroys or removes the myelin sheath of a nerve or nerves in a patient. See Dorland's Illustrated Medical Dictionary (1974).

nerve. (Testimony of Drs. Herskovits and Schulein; Defendant's exhibit 34.)

12. Mrs. Hitchcock's symptoms closely resemble multiple sclerosis.[3] Several doctors have diagnosed her disease as multiple sclerosis. Multiple sclerosis is a demyelinating disease for which there is no known cause or cure. (Testimony of Drs. Herskovits and Schulein.)

13. DEV is an antirabies vaccine introduced in 1955 and licensed for use in the United States in 1957. DEV was developed by Eli Lily and Company as an alternative to older nervous tissue vaccine ("NTV"). Serious post-vaccinal neurologic reactions to NTV, including paralysis and death, are not uncommon and make its use hazardous." (Plaintiff's exhibit 15, at 643.) For example, the rate of death for persons immunized with NTV has been estimated at 1 to 35,000. DEV is a suspension of 10% duck embryo tissue infected with a fixed virus and then inactivated. DEV is thought to contain little or none of the "paralytic factor" that causes paralysis and death after treatment with NTV. The identity of the "paralytic factor," however, is not known with certainty. DEV has been described as "markedly reducing" the hazard of post-vaccinal neurologic complications and as "relatively safe". Nevertheless, because DEV contains duck embryo protein, it is capable of causing neurologic reactions similar to NTV.

(Plaintiffs' exhibits 15, 22, and 59(c); Defendant's exhibits 26 and 27; deposition of Dr. Stanley Plotkin, an expert on rabies and rabies vaccine, May 10, 1979 at 23–24.)

14. Defendant's Duty to Inform: Risk. In May and June, 1972, defendant United States and its agents knew, or should have known, that there existed some risk of serious neurologic reaction in a patient treated with multiple injections of DEV as pre-rabies exposure prophylaxis.

This finding is based on testimony offered at trial and on information contained in the following materials of which defendant and its agents knew, or should have known, in May and June, 1972:

A. The DEV product information sheet dated April 5, 1972, prepared by Eli Lily and Company, the manufacturer of DEV, and distributed with the vaccine does not state that there is no risk of paralysis or other serious neurologic reaction to DEV, but rather ambiguously advises that DEV "contain[s] little or none of the 'paralytic factor' . . . ."

The product information sheet does not unconditionally recommend a post-exposure DEV prophylaxis, notwithstanding the fact that if rabies develops it will almost certainly be fatal:

*Postexposure Immunization* —Indications for and against giving rabies vaccine are difficult to define. In favor of giving it is the fact that, if rabies develops, it will almost certainly have fatal results. Against giving it is the danger of development of severe side-effects involving the central nervous system when the vaccine contains brain tissue . . . the incidence of neurological side-effects has been low with the use of duck embryo vaccine.

The product information sheet describes certain reported cases of adverse reaction to the post-exposure series of DEV:

ADVERSE REACTIONS

&ast; &ast; &ast; &ast; &ast; &ast;

In connection with the administration of about 90,000 fourteen-dose [post-exposure] courses of duck-embryo vaccine there have been reports of two patients with symptoms suggesting encephalitis and two with transverse myelitis. All four patients recovered completely. If symptoms appear that indicate central-nervous system involvement, vaccine injections should be discontinued.

(Plaintiffs' exhibit 59(c).)

B. The minimum post-exposure DEV series in 1972 consisted of one injection daily

---

3. "Multiple sclerosis" is defined as "a disease in which there are patches of demyelination throughout the white matter of the central nervous system, sometimes extending into the gray matter. Typically, the symptoms . . . are weakness, incoordination, paresthesias, speech disturbances and visual complaints." *Dorland's Illustrated Medical Dictionary* (1974).

for fourteen days. The pre-exposure series used by the Department in 1972 consisted of three injections: the first two given one month apart, and the third "booster" to be given seven months later. The only difference between the pre- and post-exposure series is the quantity of the vaccine administered.

(Plaintiffs' exhibits 71 and 59(c).)

C. The "Recommendation of the Public Health Service Advisory Committee on Immunization Practices" (October, 1969), advises, in part, that:

> The problem of whether or not to immunize those bitten or scratched by animals suspected of being rabid is a perplexing one for physicians. *All available methods of systemic treatment are complicated by numerous instances of adverse reactions, a few of which have resulted in death or permanent disability*
>
> . . . . .
>
> The *relatively low* frequency of reactions to DEV has made it more practical to offer pre-exposure immunization to persons in high-risk groups . . . .
> (Emphasis added.)

(Defendant's exhibit 26.)

D. A letter dated September 25, 1970, from Dr. Michael Hattwick, a rabies expert for the Center for Disease Control located in Atlanta, Georgia, addressed to Dr. Martin Wolfe, Department of State, advises, among other things, that while serious reactions to DEV pre-exposure prophylaxis have been observed to occur less frequently than serious reactions to DEV post-exposure prophylaxis, such reactions, although not common, do occur:

> Reactions to duck embryo vaccine are of several types most conveniently minor reactions, neurological reactions, and true allergic reactions . . . . Neuroparalytic reactions have been described only after the post-exposure treatment of rabies. There does not seem to be any significant risk of neuroparalytic reactions to the pre-exposure prophylaxis schedule . . . .

> It must be stressed that serious reactions to rabies pre-exposure prophylaxis are not common. In areas where the potential exposure to rabies is high as it apparently is in the Karachi [Pakistan] area, the unlikely possibility of allergic reactions should not prevent vaccination of persons at high risk.

(Defendant's exhibit 17.)

E. Prussin & Katabi, "Dorsolumbar myelitis following antirabies vaccination with duck embryo vaccine", *Annals of Internal Medicine*, 60: 114–116 (1964), reporting a case of transverse myelitis after injection with DEV in a post-exposure series. (Reference at Plaintiff's exhibit 15, n. 14.)

F. Harrington & Olin, "Incomplete transverse myelitis following rabies duck embryo vaccination", *Journal of the American Medical Association*, 216: 2137–2138 (1971), reporting a case of transverse myelitis after treatment with DEV during a post-exposure series. The article also notes that:

> The Public Health Service has reported that neurologic complications with rabies duck embryo vaccine occurred in 1 per 25,000 cases, with one death in 225,000 persons immunized.

Neurologic side-effects of DEV in 1 per 25,000 cases may be compared with the estimate of deaths resulting from NTV vaccination in 1 per 35,000 cases. NTV has been described as "hazardous." *See* p. 68, *supra* (Plaintiffs' exhibit 22.)

G. Shiraki, Hirotsugu, "The Comparative Study of Rabies Postvaccinal Encephalomyelitis and Demyelinating Encephalomyelitides of Unknown Origin, with Special Reference to the Japanese Cases" (1968).

This paper states, among other things, that there were 41 cerebral encephalomyelitic reactions to post-exposure series of NTV in Japan from 1947 to 1959. In 48 examples of the spinal form there were 5 fatalities, 19 incomplete recoveries and 24 complete recoveries. Among the 41 cases of the cerebral form there were 8 fatalities, 27 incomplete recoveries and 6 complete recoveries. It appears that no report of the more severe cerebral form of the disease had

appeared in the Western literature, at least at the time this earlier article was written.

The article concludes:

It is clear that the morphologic characteristics of both [spinal and cerebral] forms of rabies post-vaccinal encephalomyelitis have *important similarities to features of acute multiple sclerosis.* (at 177) (Emphasis added.)

These features include involvement of the cerebral hemispheres, the optic nerve, brain stem and spinal cord.

(Plaintiffs' exhibit 53.)

H. Rubin, Hattwick, Jones, Gregg and Schwartz, "Adverse Reactions to Duck Embryo Rabies Vaccine" (1973).[4] This article compiles and comments upon retrospective reports of side-effects resulting from DEV vaccination during the period 1958 to 1971 and prospective studies of DEV side-effects begun in 1969 and conducted by the Center for Disease Control in Atlanta, Georgia. The research of the Center for Disease Control revealed that, although the incidence of serious reactions, including neuroparalytic reactions, to DEV is significantly less than similar reactions to NTV, DEV is only "relatively safe." The relatively low risk of serious reactions to DEV has made it possible to introduce a pre-exposure prophylaxis for individuals such as veterinarians and animal handlers, who are "significantly at risk of being exposed to rabies."

The article states that:

—Serious reactions to [DEV] are relatively rare; only four neurologic complications and one death were reported in the first 50,000 treated individuals . . . . [The] relative safety [of DEV] has made possible the introduction of preexposure prophylaxis for such individuals as veterinarians and animal handlers, who are significantly at risk of being exposed to rabies. [at 643.]

—Approximately 424,000 persons in the United States received DEV between 1958 and 1971. Minor neurologic reactions to DEV were reported in one hundred thirty-seven cases; symptoms included listlessness, increased fatiguability or sleepiness. Major neurologic reactions, defined as "major neurologic dysfunction lasting more than 4 days, beginning within 6 weeks of vaccination and with no clear causative agent known", were reported in thirteen cases. All of the reported cases had onsets between 3 and 16 days after initiation of the vaccine series. Four cases of transverse myelitis were reported after use of DEV in patients 20 to 56 years of age; symptoms were similar in all patients: "painless, flaccid paraplegia; loss of reflexes in the legs; bladder paralysis and obstipation; sensory loss at a spinal level; and temperature as high as 38.9 °C [102 °F]." [at 645.]

—The estimated incidence of major neurologic reactions to DEV based on retrospective reports from 1958 to 1971 is 3.1 per 100,000 vaccinees. No neurlogic reac-

4. This article was the product of thirteen years of research by the Center for Disease Control relating to complications in the administration of DEV. The Center for Disease Control is part of the Health Services and Mental Health Administration, Public Health Service, Department of Health, Education and Welfare. Defendant and its agents, the Department and the Department of State Office of Medical Services, may be charged with knowledge of the contents of this article, which made public in 1973 the results of ongoing research of DEV complications compiled by an instrumentality of the federal government. There is also evidence in the record that Dr. Martin Wolfe, Department of State Office of Medical Services, was in contact by letter with one of the authors of the above-mentioned article, Dr. Michael Hattwick of the Center for Disease Control, concerning

possible side-effects of DEV pre-exposure prophylaxis as early as September, 1970. Defendant's exhibit 17. In Dr. Hattwick's letter of September 25, 1970, to Dr. Wolfe, Dr. Hattwick wrote:

"Here at the CDC [Center for Disease Control] we initiated in the spring of 1969 a prospective study of the complications of pre-exposure prophylaxis and a preliminary one year study of this report should be available in the next few months. We will be happy to forward a copy of this to you if you desire." (Defendant's exhibit 17 at 2.)

There is no evidence that Dr. Wolfe or the Office of Medical Services ever requested the preliminary report mentioned by Dr. Hattwick in his letter.

Dr. Hattwick testified as an expert witness for the defendant in this case.

tions to DEV were observed in prospective studies of preexposure prophylaxis in an initial group of 1,679 veterinary students and Peace Corps volunteers or of postexposure prophylaxis in 116 patients. All reported neurologic reactions began 3 to 16 days after the first dose and all but one occurred during postexposure therapy. [at 648.]

(Plaintiffs' exhibit 15.)

I. At a deposition taken on May 10, 1979, Dr. Plotkin, an expert on rabies and rabies vaccines, testified that:

Q. Now, isn't it a fact, Doctor, that some reactions to the duck embryo vaccine as known based on knowledge in 1972 resulted in permanent neurological damage?

A. . . . [C]ertainly it was considered in 1972 as it is now, that there are infrequent neurologic reactions to duck embryo vaccine.

Q. And these could be of a permanent—

A. Now, . . . I remember specifically that of the four cases of encephalitis, two died and two recovered, leaving none with permanent damage, so to speak.

(Plotkin deposition at 51–52.)

15. Defendant's Duty to Inform: Potential Benefits. The benefits of DEV pre-exposure prophylaxis to Mrs. Hitchcock, a fifty-one year old woman preparing to accompany her husband to live in Buenos Aires, Argentina were relatively minor.

This finding takes into account that a significant percentage of animal rabies cases reported in Argentina during the period 1970 to 1974 involved agricultural animals (animals not likely to be encountered by the wife of a Foreign Service Officer residing in the city of Buenos Aires); that the number of cases of human rabies from 1970 through 1974 averaged approximately seven cases per year for the entire country of Argentina; that rabies rarely occurs unless an individual has been bitten and, if bitten, that a complete post-exposure series of DEV injections may well be required, just as if no pre-exposure series had been given.

The foregoing is supported by testimony given at trial and the following evidence:

A. The incidence of rabies in humans in Argentina during the period 1970 to 1974 was:

| | |
|---|---|
| 1970: | 11–13 cases |
| 1971: | 2 cases |
| 1972: | 1–2 cases |
| 1973: | 12 cases, 8 of which occurred in metropolitan Buenos Aires |
| 1974: | 7 cases, 6 of which occurred in metropolitan Buenos Aires |

The population of metropolitan Buenos Aires in 1976 was approximately seven million.

In 1970, approximately 22.6% of reported rabies in animals in Argentina occurred in farm animals. In 1973, this figure was approximately 8.5%.

(Stipulation of June 28, 1979; Defendants' exhibits 20, 22 and 46.)

B. The product information sheet for DEV prepared by Eli Lily and Company and dated April 5, 1972, states among other things, that the following factors should be taken into account in determining whether to administer post-exposure DEV prophylaxis:

(1) Approximately 20 percent of persons who are bitten by animals known to be rabid have developed rabies if not treated with rabies vaccine, and (2) rabies rarely occurs unless the individual actually has been bitten by the animal.

With respect to the prophylactic value of pre-exposure vaccination with DEV in light of an actual exposure to rabies, including exposure due to a suspected but not confirmed rabies carrier, the manufacturer explains that:

If mild exposure [including, e. g., a lick on abraded skin or on mucosal surfaces, or single bites *not* on the head, neck, face or arm] occurs, individuals in whom rabies antibody has been determined to be present can be given a single 1–ml. booster dose of vaccine. If exposure is severe [including e. g., multiple bites or single bites on the head, neck, face, or arm] or

due to bites of wild animals, the usual postexposure immunization [of 14 injections of DEV] . . . should be followed (see Indications). (Emphasis in original.)

(Plaintiffs' exhibit 59(c).)

C. A document entitled "UNIFORM STATE/AID/USIA REGULATIONS, POLICIES AND PROCEDURES FOR IMMUNIZATIONS", 3 FAM 680, Appendix A, dated 4–22–71, states, among other things, that:

> *Special Information: Important*—in case of exposure to an individual who has received this pre-exposure [DEV] immunization; the usual post-exposure [series] . . . should be given. (Emphasis in original.)

(Defendant's exhibit 13.)

D. A document entitled "IMMUNIZATION GUIDE FOR EMPLOYEES AND THEIR DEPENDENTS TRAVELING OR RESIDING IN FOREIGN COUNTRIES, dated April, 1971, contains a summary of the recommendations governing vaccinations offered without charge by the Immunization Clinic of the Department of State. This document states, in part, that:

> [A] pre-exposure immunization . . does not preclude the necessity of obtaining a series of injections in the event of subsequent exposure to a rabid animal.

(Plaintiffs' exhibit 71.)

16. <u>Defendant's Duty to Inform: Diminished Benefits.</u> The potential benefits of DEV pre-exposure prophylaxis to Mrs. Hitchcock were further severely attenuated because the Department and the Office of Medical Services failed to disclose to Mrs. Hitchcock that any future benefit to her from the pre-exposure prophylaxis depended upon her taking a test (termed an "antibody titer") to determine the production of rabies antibody in her system. Without a subsequent antibody titer, a vaccinee receiving the DEV pre-exposure series would be required to receive the *entire* post-exposure series after any exposure to rabies,

---

**5.** The product information sheet generally advises that a full post-exposure series of at least 14 DEV injections be given a patient whose

whether severe or mild. See plaintiffs' exhibit 59(c) quoted at ¶ A, *infra*.

Mrs. Hitchcock was not informed of the existence of or the necessity for a subsequent antibody titer in May or June, 1972, although she was informed at those times of the requirement that she subsequently receive a third "booster" injection of DEV six or seven months later and this was noted on her immunization record (Plaintiffs' exhibit 13). Nor did the Department provide for administration of antibody titers. Mrs. Hitchcock did not receive an antibody titer until 1975, when it was administered by a private physician, not the defendant.

These findings are supported by testimony at trial and the following evidence:

A. The Eli Lily and Company product information sheet for DEV, dated April 5, 1972, provides, in part, that:

> *Preexposure Immunization*—. . . Because the antibody response is not 100 percent, *an antibody titer must be determined* after the course of immunization. (Emphasis in original.)

The product information sheet conditions the limited benefit of DEV pre-exposure prophylaxis, which benefit is itself confined to "mild" exposure to rabies,[5] on a determination, *prior* to exposure, that the exposed individual has developed rabies antibody:

> If mild exposure [including *e. g.*, a lick on abraded skin or on mucosal surfaces, or single bites *not* on the head, neck, face or arm] occurs, *individuals in whom rabies antibody has been determined to be present* can be given a single 1–ml. booster dose of vaccine. (Emphasis added.)

(Plaintiffs' exhibit 59(c).)

B. A document entitled "Recommendation of the Public Health Service Advisory Committee On Immunization Practices", dated October, 1969, advises medical personnel, in part, that:

> All who receive pre-exposure vaccination should have their serum tested for

---

exposure to rabies has been "severe," regardless of whether or not the patient has received the pre-exposure DEV series. See p. 13, *supra*.

neutralizing antibody 3 to 4 weeks after the last injection. . . . . If it is not known whether an exposed person had antibody, the complete post-exposure antirabies treatment should be given. (Defendant's exhibit 26.)

C. Neither the Immunization Guide prepared by the Immunization Clinic of the Department of State (Plaintiffs' exhibit 71), the Procedures Memorandum of the Office of Medical Services, Department of State (Defendant's exhibit 13) nor any other evidence (including testimony) received at trial, indicates that the Department of State made available post-immunization rabies antibody tests for DEV vaccinees or advised vaccinees to obtain such a test privately.

D. Mrs. Hitchcock's first antibody titer against rabies was performed privately (not by defendant) in 1975, three years after her vaccination. (Plaintiffs' exhibit 10 to the Plotkin deposition; testimony of Mrs. Hitchcock.)

17. With Adequate Disclosure, A Reasonable Person In Mrs. Hitchcock's Circumstances Would Have Declined DEV Pre-exposure Prophylaxis. Adequate disclosure of the risk of neurologic side-effects weighed against the potential benefits of receiving only marginal protection against rabies infection while residing in Buenos Aires, Argentina, could reasonably be expected to have persuaded a person in Mrs. Hitchcock's circumstances to have declined DEV pre-exposure prophylaxis in May and June, 1972.

The point of departure for analysis of this issue is the advice repeated in the literature that DEV's "relatively low" frequency of serious reactions makes it "more practical" to prescribe in a pre-exposure series for certain "high risk" individuals; i. e., individuals for whom rabies is a "constant threat", such as veterinarians, spelunkers and laboratory personnel working with rabies virus.

A reasonable person would not have concluded that Mrs. Hitchcock, a then fifty-one

year old woman, planning to live in the embassy section of the city of Buenos Aires, was a "high risk" individual for whom rabies was a "constant threat."[6] Nor did Mrs. Hitchcock's position sufficiently resemble such an individual so that she could have reasonably anticipated circumstances which could justify her assuming the risks of taking the DEV pre-exposure series. (The only difference between the pre-exposure immunization and the post-exposure immunization is quantitative: two to three doses, one month apart, versus 14 doses over a longer period of time.) The "relatively low" risk of serious side-effects with DEV—including severe neurologic side-effects such as paralysis and death—is not the kind of risk that a reasonable person would take without reasonable assurances of substantial benefit, not apparent here.

DEV pre-exposure prophylaxis against rabies was not a course of treatment concluded to be necessary in the exercise of informed medical judgment at the time. The Office of Medical Services of the Department of State did not require or even strongly recommend DEV pre-exposure prophylaxis. Nevertheless, the attending nurse employed by defendant routinely administered DEV pre-exposure prophylaxis to Mr. and Mrs. Hitchcock.

Taking into account (1) the relatively low probability of exposure to rabies to be reasonably anticipated for a woman of Mrs. Hitchcock's age, position, and prospective residence, (2) the limited protection afforded by DEV pre-exposure prophylaxis, even in conjunction with a subsequent antibody titer, (3) the failure of the Department either to advise plaintiffs of the necessity for a subsequent antibody titer or to provide any procedure to take antibody titers in patients treated with DEV pre-exposure prophylaxis by the Department, and (4) the possibility of severe neurologic reaction, including paralysis and death, as a result of receiving a pre-exposure series of DEV in-

6. As set out in paragraph 15A, *supra*, the number of reported rabies cases in humans in Argentina in 1971 and 1972 was one or two. The number of rabies cases in humans in metropolitan Buenos Aires in 1973 was eight and in 1974 the number was six. The population of metropolitan Buenos Aires in 1976 was approximately seven million.

jections, it is established by a preponderance of the evidence that, if the risks and benefits had been disclosed to a reasonable person in Mrs. Hitchcock's position, she would have declined to receive DEV pre-exposure prophylaxis.

This finding is based on paragraphs 14, 15, and 16 of this Memorandum and on testimony received at trial. It is also particularly confirmed by the following evidence:

A. A "Recommendation of the Public Health Service Advisory Committee on Immunization Practices" dated October, 1969, suggests that it is only the high risk of repeated rabies exposure for certain individuals (e. g., veterinarians) that outweighs, for them, the "relatively low" frequency of serious reactions to DEV, thereby making it "more practical" to offer DEV pre-exposure prophylaxis to those individuals. The Recommendation states, in part, that:

PRE–EXPOSURE PROPHYLAXIS

The relatively low frequency of reactions to DEV has made it more practical to offer pre-exposure immunization to persons in high-risk groups: veterinarians, animal handlers, certain laboratory workers, and *individuals, especially children, living in areas of the world where rabies is a constant threat.* Others whose vocational or avocational pursuits result in frequent contact with dogs, cats, foxes, skunks or bats should also be considered for pre-exposure prophylaxis. (Emphasis added.)

(Defendant's exhibit 26.)

B. The Eli Lily and Company DEV product information sheet dated April 5, 1972, guardedly advises that DEV pre-exposure prophylaxis "*may be* desirable for certain high-risk individuals." (Emphasis added.) The Lily product information sheet states, in relevant part, the following:

*Preexposure Immunization*—Vaccination with duck embryo rabies vaccine before exposure occurs may be desirable for certain high-risk individuals. These include veterinarians, deliverymen, meter readers, spelunkers, laboratory personnel working with rabies virus, and perhaps others.

Although 20 percent of individuals bitten by animals known to be rabid develop rabies and rabies, once contracted, is almost 100% fatal if not treated, the Lily product information sheet does not unequivocally recommend a post-exposure DEV series for individuals who have been exposed to rabies. The product information sheet notes that:

*Postexposure Immunization*—Indications for and against giving rabies vaccine are difficult to define. In favor of giving it is the fact that, if rabies develops, it will almost certainly have fatal results. Against giving it is the danger of development of severe side-effects involving the central nervous system when vaccine contains brain tissue. Experiments have shown that duck-embryo tissue contains little or none of the "paralytic factor", and the incidence of neurological side-effects has been low with the use of duck-embryo vaccine.

(Plaintiffs' exhibit 59(c). *Compare* ¶ 15(B), *supra.*)

C. Rubin, Hattwick, Jones, Gregg and Schwartz, "Adverse Reactions to Duck Embryo Rabies Vaccine" (1973), provides, in part, that:

The *relative safety* [of DEV] has made possible the introduction of preexposure prophylaxis for such individuals as veterinarians and animal handlers, who are *significantly at risk of being exposed to rabies.* (at 643.) (Emphasis added.)

(Plaintiffs' exhibit 15.)

D. A "Procedures Memorandum" of the Office of Medical Services, Department of State, dated June 1, 1972, provides that immunization against rabies is not among the immunizations required for international or military travel, nor is it among the immunizations "strongly recommended" by the Department. DEV vaccination is listed as an "additional recommendation" of possibly, among others, "the Office of Medical Services (see FAM 680 Appendix A.)"

(Defendant's exhibit 16.)

E. A document entitled "UNIFORM STATE/AID/USIA REGULATIONS, POL-

ICIES AND PROCEDURES FOR IMMU-NIZATIONS", 3 FAM 680 Appendix A, and dated April 22, 1971, advises among, other things, that:

> Rabies prophylaxis, before exposure, is indicated for *individuals with an unusual risk of repeated exposure* . . . . (Emphasis added.)

(Defendant's exhibit 13.)

F. A document entitled "IMMUNIZA-TION GUIDE FOR EMPLOYEES AND THEIR DEPENDENTS TRAVELING OR RESIDING IN FOREIGN COUNTRIES", dated April, 1971 and prepared by the Immunization Clinic of the Department of State as a summary of its recommendations, advises, in part, the following:

> RECOMMENDED IMMUNIZA-TIONS—Determined by conditions in the country in which residing or countries through which traveling . . . . .
>
> RABIES (Duck Embryo Vaccine) . . It is recommended for individuals living in areas of the world where rabies is a constant threat.

(Plaintiffs' exhibit 71.)

G. At a deposition taken on May 10, 1979, Dr. Plotkin suggested that the question of whether or not to vaccinate an individual may, at times, admit of no easy answer, presumably because of the difficulty in weighing the risks and benefits of such vaccination. Dr. Plotkin stated, among other things, that:

> . . . because of my special interest in rabies I do a great deal of consultation with other physicians and inoculations against rabies. The questions of whether to vaccinate, when to vaccinate, are sometimes very complicated and physicians will often call for help relative to that point.

(Plotkin deposition at 7.)

18. Unrevealed Risk Materialized: DEV Caused Or Aggravated Mrs. Hitchcock's Demyelinating Disease. The risk of serious neurologic reaction to the pre-exposure series of DEV materialized in Mrs. Hitchcock's case in the form of a progressive, chronic demyelinating disease which she contracted or which was aggravated as a result of the DEV injections. The smallpox vaccination administered to her in November, 1973, may also have contributed to her present condition.

Plaintiffs have established by a preponderance of the evidence that the DEV injections given Mrs. Hitchcock in 1972 either (a) caused her demyelinating disease or, (b) if Mrs. Hitchcock's transient loss of vision in her right eye in 1954 was an early symptom of multiple sclerosis (a fact which cannot now be either proved or disproved), triggered an otherwise dormant demyelinating disease or accelerated a very slowly developing one.

The finding that the DEV injections caused Mrs. Hitchcock's demyelinating disease is supported by the persuasive similarity between Mrs. Hitchcock's symptoms and confirmed neurologic reactions in other patients to NTV and DEV. Mrs. Hitchcock's symptoms of fatigue and loss of reflexes in her legs, later developing into paraplegia, and optic neuritis are typical examples of serious neurologic reactions to NTV and DEV. *See, e. g.,* Plaintiffs' exhibits 15 at 645 and 53 at 117–120. The incubation period for Mrs. Hitchcock's disease is also consistent with reported cases. Mrs. Hitchcock first complained of symptoms of fatigue in her legs almost immediately after receiving the DEV injections in 1972. The onset of serious neurologic symptoms (numbness in her hands) began in February, 1973 and was unmistakable by May, 1973, approximately one year after the first injection. Although a one-year interval between vaccination and onset of serious neurologic symptoms is apparently not typical, the relevant medical literature contains reports of similar intervals of up to twenty years. See ¶ 19(A), *infra; compare* Plotkin deposition at 50.

On the other hand, even if, at the time of DEV injections in 1972, Mrs. Hitchcock had been suffering from some form of multiple sclerosis since 1954 (when the transient loss of vision in her right eye may have been due to optic nerve involvement, signaling the onset of multiple sclerosis), Mrs. Hitch-

cock apparently experienced no further symptoms of demyelination until shortly after the DEV injections in 1972. The explanation of her disabling disease most plausible to the Court in these circumstances is that the injections triggered an otherwise dormant disease or aggravated and accelerated an otherwise very slowly progressing one.

Both of these explanations are more plausible and find more support in the record than defendant's theory: viz., that Mrs. Hitchcock cannot carry her burden of proving that the DEV injections caused her disease because her disease is multiple sclerosis and the cause of multiple sclerosis is unknown.

These conclusions are based on the Findings of Fact set out above, upon testimony at trial and upon the following evidence:

A. In a letter to the Editor of the Archive of Neurology, Vol. 35, Oct. 1978, Drs. Britton, Houff and Eiben of the National Institutes of Health in Bethesda, Maryland, reported a case of a slowly progressive central nervous system disease in a patient who had received a post-exposure Semple [NTV] series of injections *four years* before. This letter traverses defendant's contention that attribution of Mrs. Hitchcock's illness to DEV has no scientific basis because too much time elapsed between vaccination and the onset of neurologic side-effects. The letter states, in part, that:

> The association of a multiple sclerosis-like illness in a patient with exposure to a nervous tissue-derived antirabies vaccine . . . allow[s] the speculation that the altered CNS immune state is related to the vaccine. The incubation period from vaccination to onset of serious neurologic symptoms in this patient was far longer than that in other cases reported in the literature. One exception is the report . . . in which 12 of the 458 patients with disseminated sclerosis had a history of antirabies vaccination 2 to 20 years prior to any neurologic symptoms. *The course of the illness in these 12 patients was chronic and progressive . . . .*

> *Demyelinating illness probably requires an antigenic stimulus to trigger it and an altered immune state to perpetuate it.* (Emphasis added.)

(Plaintiffs' exhibit 43.)

B. If Mrs. Hitchcock was suffering from a central nervous system disorder prior to the administration of DEV prophylaxis in May and June, 1972, that disorder could have been aggravated by the DEV. (Testimony of Dr. Restak, an expert neurologist.)

C. To a reasonable degree of medical certainty—approximately 75 to 80 percent —Mrs. Hitchcock is suffering from a demyelinating disease caused by the administration of DEV pre-exposure prophylaxis to her in May and June, 1972. (Testimony of Dr. Herskovits.)

D. Dr. Melvin Yahr, an expert neurologist, addressed a letter to Dr. Herskovits dated October 15, 1975, two days after Dr. Yahr had examined Mrs. Hitchcock. In his letter, Dr. Yahr said the following:

> The cause of [Mrs. Hitchcock's] disorder cannot be stated unequivocally but is certain (sic) in keeping with a demyelinating disease process. Had the episode of visual loss in 1954 been documented as optic nerve involvement there would of course be no doubt that she is suffering from multiple sclerosis. However, since an alternative cause for her visual difficulty is reported by her ophthalmologist, one has to hold this diagnosis in abeyance. One must raise the possibility of some type of hypersensitivity reaction to the antirabies vaccine, in view of its reported relationship to demyelinating disease. As you know this was documented in Japan some years ago with an implied relationship to multiple sclerosis.

(Plaintiffs' exhibit 4.)

E. In August, 1976, Dr. Yahr wrote the following letter to Dr. Herskovits:

> Thank you very much for sending me the additional information on Mrs. Hitchcock. I assume the implication is that the rabies immunization was the cause of her neurological disorder and this may well

be true. Indeed, I raised the possibility in my letter. However, it is going to be a difficult situation to prove.

(Defendant's exhibit 47.)

F. At his deposition, Dr. Plotkin, an expert on rabies and rabies vaccine, testified that DEV, like all vaccines containing protein from another species, can cause neurologic reactions in vaccinees. Dr. Plotkin testified upon cross-examination as follows:

Q. Doctor, what is the factor, element, particle, if you will, in the duck embryo vaccine that causes the reactions?

A. It is the *duck embryo protein itself*, that is, every species has proteins that are native to that species alone, and since the duck embryo vaccine is prepared by inoculating duck embryos, there is inevitably going to be duck protein in the final vaccine. (Emphasis added.)

Dr. Plotkin had previously testified upon direct examination as follows:

Q. What advantages, if any, does the new human cell [antirabies] vaccine have over the duck embryo vaccine?

A. Basically two. One is that it . . produces immunity much better than the duck embryo vaccine. And second, because it is produced in human cell culture, it does not have duck embryo protein and therefore, people are not made allergic to duck embryo by being injected.

Q. Does it have any advantage with regard to possible neurologic reactions?

A. I would say yes *because there's no—nothing in the [new human cell] vaccine except purified rabies virus. So it should in principle produce no neurologic reactions.* (Emphasis added.)

(Plotkin deposition at 23–24.)

With respect to the effect on Mrs. Hitchcock's present condition of a smallpox vaccination given to her in November, 1973, Dr. Plotkin stated that:

. . . Of course, smallpox vaccination itself is associated with post-vaccination encephalitis, so, that introduces a complicating factor.

(Plotkin deposition at 49.)

Regarding the period of time between injection of NTV and the manifestation of neurologic symptoms in reported cases, Dr. Plotkin testified on deposition that:

. . . [T]he great majority [of] recorded reactions have been within a couple of months of vaccination. Now, the Japanese papers quote longer incubation periods to the reactions. And I think that's certainly very interesting, I don't know exactly what to make of it.

(Plotkin deposition at 50.)

Although Dr. Plotkin did not recall any instances of other permanent, progressive neurologic disease resulting from DEV injection, he also stated that:

I would say . . . that any time you have a neurologic reaction there is a possibility that it's going to be permanent.

(Plotkin deposition at 52. *And see* ¶ 14I, *supra.*)

19. Mr. Hitchcock's Damages. Mr. Hitchcock's injuries resulting from the total incapacitation of his wife include loss of consortium and loss of marital services. (Testimony of Mr. and Mrs. Hitchcock.)

20. The damages awarded to Mr. and Mrs. Hitchcock take into account the following:

A. The demyelinating disease from which Mrs. Hitchcock suffers resembles, or may even be, multiple sclerosis, recognizing that the cause of multiple sclerosis is unknown;

B. There is a possibility that before May, 1972, Mrs. Hitchcock suffered from multiple sclerosis or some other demyelinating disease and that the DEV injections triggered or aggravated a dormant or slowly progressing disease;

C. There is a possibility that multiple sclerosis or other demyelinating disease caused, triggered, or aggravated by the DEV was further aggravated by a smallpox vaccination in November, 1973;

D. The parties understood that Mrs. Hitchcock, as the wife of a Foreign Service Officer, would assist her husband in carrying out his duties while serving abroad; by performing mission-related

functions and refraining from work and activities considered by defendant to be inappropriate for a Foreign Service Officer's wife in the field; and that her performance of those functions and refraining from others were of great value, both to her husband, and to the United States.

E. As a Foreign Service Officer's wife, Mrs. Hitchcock's status had many of the elements of an employee of defendant.

21. The pecuniary damages to be awarded Mrs. Hitchcock in light of the foregoing Findings of Fact, *supra*, and the Conclusions of Law, *infra*, include:

| | | |
|---|---|---|
| A. | Medical expenses (as stipulated) | $ 99,212.00 |
| B. | Compensatory damages [7] | 319,839.00 |
| C. | Pain and suffering . | 50,000.00 |

Mr. Hitchcock has suffered a loss of consortium and marital services entitling him to a separate damage award of $50,000.

## II. *Conclusions of Law*

The Court adopts the foregoing Findings of Fact and concludes, under applicable law, that plaintiffs are entitled to judgment against defendant as follows:

 1. Defendant is liable to Mrs. Hitchcock. The standard of reasonable care for the administration of inoculations in 1972, as set forth in *Canterbury v. Spence*, 150 U.S.App.D.C. 263, 464 F.2d 772 (1972), *cert. den.* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1973), was not met by defendant.

A. The defendant was under the general duty imposed upon a physician to exercise reasonable care for the benefit of his patient. This duty normally requires the physician to advise the patient of the expected benefits and to warn the patient of any risks to her well-being which contemplated therapy may involve. 150 U.S.App.D.C. at 272, 132, 464 F.2d at 781 and n. 132.

B. The physician's duty to disclose includes the duty to communicate to the patient alternative treatments available, if any, the likely results if the patient remains untreated, and the incidence of injury and the degree of harm threatened by the treatment. 150 U.S.App.D.C. at 278–79, 464 F.2d at 787–88.

C. In May and June, 1972, defendant knew, or should have known, that there was a possibility of serious neurologic reaction, including paralysis and death, resulting from DEV pre-exposure prophylaxis. Defendant knew, or should have known: (1) that the probability of contracting rabies unless bitten is low and, (2) that once bitten, the probability of needing a full post-exposure prophylaxis in spite of having taken the pre-exposure series is relatively high and (3) that the value of any pre-exposure series was therefore very limited for an individual like Mrs. Hitchcock, who could reasonably have considered herself an individual who had no "unusual risk of repeated exposure" to rabies. Defendant's exhibit 13.

Defendant did not cause a physician to be present at the vaccination of Mrs. Hitchcock and the nurse who was present and who routinely administered the vaccine to Mrs. Hitchcock did so without disclosing to her (1) that vaccination with DEV was not required by the Department or even strongly recommended by the Office of Medical Services, (2) the limited and conditional nature of benefits to be derived from vaccination with DEV, and (3) the incidence of injury and the degree of harm threatened by such vaccination.

Defendant also knew, or should have known, of the necessity for a post-vaccinal test for rabies antibody if the pre-exposure prophylaxis is to have any practical value for a vaccinee. Defendant did not disclose to Mrs. Hitchcock the necessity or existence of such a test. Defendant provided no program for the administration of such a test, nor did Mrs. Hitchcock receive such a test until 1975, in the course of consulting a physician about her demyelinating disease.

---

**7.** In consideration of finding 20, among others, this amount is computed as fifty percent of the present value of the disability payments Mrs. Hitchcock would have received if she had held her husband's rank in May, 1973. The date of May, 1973, is as stipulated by the parties.

D. Adequate disclosure of the risk of possible serious neurologic side effects, including paralysis and death, as measured against the possible benefits of receiving some protection against rabies infection could reasonably be expected to have caused plaintiff to have declined the treatment offered. As our Court of Appeals has observed:

A very small chance of death or serious disablement may well be significant; a potential disability which dramatically outweighs the potential benefit of the therapy or the detriments of the existing malady may summons discussion with the patient.

150 U.S.App.D.C. at 279, 464 F.2d at 788.

E. The unexplained risk of serious neurologic side-effects resulting from DEV injections materialized in the form of a chronic, progressive demyelinating disease, either caused, triggered or aggravated by the injections of DEV administered to Mrs. Hitchcock by defendant.

This demyelinating disease has left plaintiff totally incapacitated.

F. Defendant breached its duty to disclose adequately the potential risks and benefits of DEV pre-exposure prophylaxis, and this failure was the proximate cause of Mrs. Hitchcock's injury. The fundamental principle that " '[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body' " was violated by defendant with respect to Mrs. Hitchcock and resulted in her receiving, without her informed consent, an optional treatment which caused her pain, suffering and a continuing, permanent disability. 150 U.S.App.D.C. at 271, 464 F.2d at 780.

■ 2. Defendant is liable to Mr. Hitchcock. As a direct result of defendant's negligence, Mr. Hitchcock has suffered loss of consortium and marital services of his wife, Margaret Hitchcock. Loss of consortium and marital services are compensable injuries under District of Columbia law. *See District of Columbia v. Barriteau*, 399 A.2d 563, at 566 (D.C.App.1979).

■ 3. Damages. This is not a private, medical malpractice case. The measure of damages applicable if the neglect of a private physician had contributed to Mrs. Hitchcock's disability is principally applicable by analogy. Nor is this a claim by a private citizen against the Government on account of injury caused by the Government to a legal stranger to it, as in a traffic accident.

This is a claim by a Foreign Service Officer and his wife on account of her disability, found to have been caused by the negligence of their employer in the course of their employment. The term "their employer" is used advisedly here, and not literally. It reflects the fact that the wife of a Foreign Service Officer abroad had duties and also limitations on her activity that were imposed by her husband's employer, the United States. In addition, the United States enjoyed valuable services as a third-party beneficiary of the marital contract as it was performed between Mr. Hitchcock and his wife.[8]

In measuring damages, therefore, the Court has adopted as a guide the obligation assumed by Congress to a Foreign Service Officer who becomes disabled in the line of duty—with or without the fault of the employer, the United States. Viewing the husband-wife Foreign Service couple effectively, if not officially and legally, as a "couple" engaged by the United States for the purpose of determining a measure of damages, the Court has awarded Mrs. Hitchcock 50% of what her husband would have received if he had been disabled in the line of duty.

---

8. *See also*, "The Right Marriage Split," New York Times June 22, 1979:

"The wives of diplomats are obliged to devote themselves full-time to their husbands' careers. They must live abroad, move their homes frequently and virtually abandon all opportunity for independent careers. And their "wifely" duties are so important to the husband's effective performance that until 1972 the State Department actually graded wives on their performance as hostesses and workers in volunteer projects wherever they were stationed."
*And see* H.R.2857, introduced March 13, 1979.

Recognizing, moreover, that Mrs. Hitchcock was not, strictly speaking, a government employee, that she has incurred medical expenses not compensated by either the government or by insurance, and that both she and her husband have suffered pain, anxiety and loss of consortium as a result of her disability, the Court has also awarded Mrs. Hitchcock the cost of her medical treatment, and a measured amount of damages to both husband and wife for the personal pain, suffering, and mutual loss of consortium, which was caused them by the negligence of the United States, its agencies and agents.

4. Plaintiffs shall receive damages as stated in the Findings of Fact which total $469,051 for plaintiff Margaret Hitchcock and $50,000 for plaintiff Wilbur Hitchcock.

5. Plaintiffs are entitled to judgment in the above amounts. A Judgment accompanies these Findings of Fact and Conclusions of Law.

### JUDGMENT

For reasons stated in open court on May 23, 1979, and in the accompanying Findings of Fact and Conclusions of Law it is this 27th day of July, 1979, hereby

ORDERED: That JUDGMENT shall be and hereby is ENTERED for PLAINTIFFS in the amount of $519,051.00.