Margaret L. HITCHCOCK and
Wilbur W. Hitchcock,

v.

UNITED STATES of America,
Appellant.

Margaret L. HITCHCOCK and Wilbur
W. Hitchcock, Appellants,

v.

UNITED STATES of America.

Nos. 79–2158, 79–2166.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 16, 1980.
Decided Sept. 3, 1981.

Bruce G. Forrest, Atty., U. S. Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., and Eloise E. Davies, Atty., U. S. Dept. of Justice, Washington, D. C., were on the brief, for appellant/cross-appellee United States of America.

Robert Case Liotta, Washington, D. C., with whom Nathan I. Finkelstein and M. Elise Haldane, Washington, D. C., were on the brief, for appellees/cross-appellants.

Before TAMM and MIKVA, Circuit Judges, and PHILIP NICHOLS, Jr.,* Judge, United States Court of Claims.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

In this case the Government appeals a judgment for plaintiffs under the Federal Tort Claims Act. Because we find that the district court applied the proper law, did not err in its findings of negligence and causation, and properly ruled the "discretionary function" exception to the Act inapplicable, we affirm.

I.

In March 1972 Mr. Wilbur W. Hitchcock, a career Foreign Service Officer, was reassigned from his post in Quebec, Canada, to Buenos Aires, Argentina. To prepare for that post, he was temporarily assigned to attend language classes at the Foreign Service Institute in Rosslyn, Virginia. His wife, Margaret L. Hitchcock, accompanied him to these classes. While attending the Institute, plaintiffs lived in Arlington, Virginia. On May 17, 1972 and June 13, 1972, Mrs. Hitchcock went to the Foreign Service Institute's medical clinic, also in Rosslyn, where she received on each occasion a pre-exposure rabies immunization using duck embryo vaccine (DEV). The vaccine was administered by a nurse. Prior to administration of the vaccine, Mrs. Hitchcock was told only that she was scheduled to receive it.

Within a few days of the first injection, Mrs. Hitchcock "had sort of a feeling of tiredness in [her] legs and heaviness." Trial transcript (Tr.) at 32; Joint Appendix (J.A.) at 127. This complaint was not altogether new. Mrs. Hitchcock had, at previous physical examinations in 1957, 1962 or 1963, 1970, and just prior to the administration of the vaccine in May 1972, reported tiredness, nervousness, and difficulty sleeping; this was the first time, however, that the complaint had been localized in her legs.

She experienced a similar feeling after her second injection in June. At the time, she attributed the tiredness to the busy schedule that the Hitchcocks were keeping and the unfamiliar hot weather in Arlington. Consequently, the problem was not brought to the attention of the State Department or a physician at that time.

In September 1972 the plaintiffs moved to Buenos Aires. Mrs. Hitchcock continued to experience tiredness and weakness. In addition, in January or February 1973, she began to experience numbness in her fingers and, subsequently, in her feet and, later still, in her legs. Mrs. Hitchcock visited Dr. Jeronimo J. B. Loray, an orthopedist. He believed that the numbness was caused by a pinched nerve in her neck and prescribed traction, massage, and vitamins. This treatment, however, was ineffective; in February and March the numbness progressed toward her waist. On a vacation with her husband in Mendoza, she "began to feel more numb and more uncomfortable." Tr. at 44; J.A. at 139.

In May 1973 Mrs. Hitchcock entered the British Hospital in Buenos Aires for tests. These tests revealed that her illness was of a neurological rather than an orthopedic nature, and she was referred to Dr. Pikielny, a neurologist. While under his care Mrs. Hitchcock read an article in *Newsweek* magazine, June 25, 1973 issue, which she understood to relate to a rare reaction to rabies vaccine. Thinking that there might be a connection between the vaccinations she had received and her illness, she mentioned this possibility to Dr. Pikielny, who, as she recalls, "said it was a very intelligent premise to present, but . . . he thought perhaps too much time had elapsed between the injection and the symptoms." Tr. at 47; J.A. at 142. Over the course of the year that Dr. Pikielny was Mrs. Hitchcock's treating physician, he permitted her to have a smallpox vaccination; this was followed by a worsening of her symptoms.

In July 1974 Mrs. Hitchcock consulted Dr. Ernesto Herskovits, also a neurologist, and has continued to see him three or four times

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976).

a year in connection with her illness. As the district court found and the parties agree:

> [B]y May, 1978, she was confined to a wheelchair. At present, Mrs. Hitchcock can stand for about five minutes and only with assistance. * * *. [Her disease] has caused paralysis, pain, numbness, limitation of physical movement, mental anguish, inability to work or to do housework, and loss of enjoyment of life. She is permanently and totally disabled.

*Hitchcock v. United States*, 479 F.Supp. 65, 67 (D.D.C.1979).

The decision to recommend that Foreign Service personnel and their families stationed in Argentina be vaccinated for rabies was made in 1968, following three overseas rabies-related deaths in the Foreign Service. Tr. at 539–40; J.A. at 636–37. The decision was reviewed and "endorsed" in April 1971. Tr. at 511–12; J.A. at 608–09. The doctor in charge of the program in 1972, Dr. Martin S. Wolfe, testified that the inoculation was recommended only, that "[t]here was no requirement for them to take it." Tr. at 539; J.A. at 636. He also testified that, if he had been a doctor on duty in an immunization clinic in 1972, he would have

> told them that there have been reported some incidences of allergic reactions, sometimes going on to anaphylactic-like reactions that we were prepared to manage; that the great majority of these would occur in the first twenty minutes before they would leave. I would warn them about subsequent possibilities in a smaller percentage of cases of development of this type of problem and to report immediately to a physician or emergency room.

> .   .   .   .   .

> I don't know that even if I had the time I would have mentioned the neurologic reactions, because they were so few and far between and had never occurred with the pre-exposure use of the vaccine.

Tr. at 538; J.A. at 635. Dr. Wolfe acknowledged, however, that the procedure he would have followed was not necessarily the practice in May 1972:

> Q. Does the State Department have any informed consent procedures for persons, as of May 17, 1972, which is given prior to the inoculation of vaccines, the injection of vaccines?
>
> A. No.

> .   .   .   .   .

> Q. . . . Did you give any information to persons prior to getting an inoculation as to the risks that might surround this injection?
>
> A. Well, as far as written material, the immunization guideline would have been available to them and material that was included in the packet [1] at the Foreign Service Institute would have been available.
>
> Q. Did a physician meet with the person before giving them an inoculation to discuss with them the risks of the injection?
>
> A. No, I don't think this would be considered feasible.

> .   .   .   .   .

> Q. Isn't it true that in May of 1972, that no physician or nurse discussed with a person about to receive the duck embryo vaccine the benefits or lack thereof of the inoculation?
>
> A. I can't say with certainty that they would not have discussed some benefit of a particular vaccine.
>
> Q. Was it the policy of the State Department?
>
> THE COURT: Did they have any orders to do that?
>
> THE WITNESS: There were no orders to discuss this with each and every vaccine, Your Honor.
>
> THE COURT: Was there any orders to discuss it with anybody?
>
> THE WITNESS: Well, I don't believe we had any orders, as such.

> .   .   .   .   .

---

1. The "packet" referred to was a guide to immunization prepared by the State Department. At the times of her inoculations, Mrs. Hitchcock had not been made aware of, and was not aware of, the existence or contents of this packet.

THE COURT: ... Were there physicians present in these places?

THE WITNESS: There was one physician who was responsible for three immunization clinics. And I can't say how he divided his time.

Q. Were the medical personnel in charge of the clinics, especially the clinic in Arlington, Virginia, instructed to take an individual medical history of a person prior to giving the duck embryo vaccine?

A. No, this would not have been feasible.

THE COURT: The answer is no?

THE WITNESS: Well, Your Honor, may I qualify that? We use medical history in a very broad sense in medicine. If he refers to a complete history or a physical exam, by no means would this be feasible. But if one considers a history of a patient asking whether he was allergic to a vaccine or did he have a prior experience with this vaccine and had a problem with it, this is common practice. And we would expect our nurses to ask this sort of question of a vaccinee.

. . . . .

Q. Doctor, there was no policy in existence in May of 1972 to give any post-injection warnings regarding duck embryo vaccine, other than to have the patient, if you will, remain [in] the facility for 15 or 20 minutes. Isn't that correct?

A. I believe it was 20 minutes. And, again, I would consider it common medical practice to advise the patient, in relation to the particular vaccine, that certain occurrences might happen longer than 20 minutes, after the 20 minutes.

Q. But, again, you don't know of your own personal knowledge whether this was being done?

A. No.

THE COURT: And there were no orders to do that?

THE WITNESS: No.

BY MR. FINKELSTEIN: .

Q. And, in fact, it wasn't the policy of the State Department to administer such warnings?

A. Not in writing. But, again, I must emphasize that with experienced people who are dealing with this in the immunization clinics, it is expected that they are aware of the types of questions and warnings that they should give to a patient regarding specific vaccines.

Q. But that is a presumption on your part?

A. Yes.

Tr. at 524–25, 527–29; J.A. at 621–22, 624–26. We read Dr. Wolfe's testimony to establish that, while he himself was aware of the risks and benefits of the vaccine, there was a low level of supervision and direction of the nurses charged with the actual inoculation of patients at the State Department clinics.

## II.

On July 1, 1977, the Hitchcocks filed suit against the United States under the Federal Tort Claims Act, claiming that as a result of defendant's negligence Mrs. Hitchcock had received two pre-exposure rabies immunization injections which were the cause of her paralysis. After a trial, United States District Judge Louis F. Oberdorfer found in plaintiffs' favor and awarded them a judgment of $519,051. The Government appeals this judgment.[2]

■ The Government challenges the district court's findings of causation and negligence. As to causation, the district court found that

Plaintiffs have established by a preponderance of the evidence that the DEV injections given Mrs. Hitchcock in 1972

---

**2.** Plaintiffs have cross-appealed for greater damages, believing that the district court erred in applying the "assumption of risk" doctrine to their recovery. Upon review of the district court's discussion of damages at a hearing on this issue, Trial transcript (Tr.) of June 5, 1979 at 32–35; Joint Appendix (J.A.) at 787–90, and his discussion of the issue in his opinion, 479 F.Supp. at 77–78, 79–80, we believe it to be clear that the district court applied assumption of risk analysis only by analogy. Finding no clear error in his damage calculation, therefore, we uphold it. *Miles v. District of Columbia*, 510 F.2d 188, 196 (D.C.Cir.1975).

either (a) caused her demyelinating disease or, (b) if Mrs. Hitchcock's transient loss of vision in her right eye in 1954 was an early symptom of multiple sclerosis (a fact which cannot now be either proved or disproved), triggered an otherwise dormant demyelinating disease or accelerated a very slowly developing one.

479 F.Supp. at 75. Because after close study we cannot say that this finding was clearly erroneous, we uphold it. Fed.R. Civ.P. 52(a).

The testimony presented on this question was expert, detailed, and conflicting. Essentially, the disagreement lay in the determination of whether Mrs. Hitchcock's clinical history and test results supported a finding that her illness was a demyelinating disease caused by the two rabies inoculations or whether that illness was in fact multiple sclerosis, of which the cause is unknown. A subsidiary question was whether, if the disease was multiple sclerosis, the vaccine might have been responsible for the substantial worsening of her health. Our reading of the record persuades us that, whether her illness was due to rabies or the multiple sclerosis, it was not a typical case of either.

Plaintiffs' main witness was Mrs. Hitchcock's physician, Dr. Herskovits, a neurologist familiar with her clinical history. He testified that he was convinced—to a reasonable degree of medical certainty—that Mrs. Hitchcock's demyelinating disease was produced by the anti-rabies vaccine. Tr. at 168; J.A. at 263. In making this diagnosis, he relied on various articles in the medical literature and on his understanding of Mrs. Hitchcock's medical history. The defendant produced a number of expert witnesses to refute Dr. Herskovits's conclusions. Dr. Richard Restak testified that it was his conclusion that Mrs. Hitchcock was suffering from multiple sclerosis. He based this conclusion largely on the results of a visual evoked response test administered in 1979, analyzed in connection with a complaint made by Mrs. Hitchcock in 1954 about her right eye, which had at that time been

diagnosed as central serous retinitis and treated by an ophthalmologist. Dr. Restak testified that the 1954 complaint, viewed in retrospect and in connection with the results of the visual evoked response test, may have been optic neuritis, possibly an early inflammation of multiple sclerosis. Tr. at 244–46; J.A. at 339–41. Dr. Marianne Scheulein testified that the "multiple areas of involvement" of the disease led her to believe that Mrs. Hitchcock was suffering from multiple sclerosis that was neither caused nor "triggered" by the vaccine. Tr. at 552, 558; J.A. at 649, 655. A deposition of Dr. Stanley Plotkin, an expert on rabies vaccine, was submitted to the effect that the level of rabies antibodies in Mrs. Hitchcock's blood, and the course of her disease, made it unlikely that her illness was caused by the vaccine. J.A. at 696, 697, 704. Dr. Michael Hattwick, also an expert on the rabies vaccine, testified that the course of Mrs. Hitchcock's disease was uncharacteristic of illnesses associated with the rabies vaccine. Tr. at 403–04; J.A. at 499–500.

Findings of error are not made on the basis of the number of experts testifying for a certain position. This court's task is to review the evidence before the district court and to decide whether "a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Upon careful scrutiny of the testimony of the expert witnesses, we are unable to conclude that the district court's finding on the causation issue was a clear error.

The Government also challenges Judge Oberdorfer's finding that it was negligent in its treatment of Mrs. Hitchcock. It makes two arguments on this point. First, defendant argues that the district court erroneously held the Government to the standard of care applicable under District of Columbia law; it contends that Virginia law, not District of Columbia law, applies to this case. Second, the Government contends that, even if the court was correct in applying District of Columbia law, it misap-

plied the relevant law to the facts of this case.[3]

■ The question of which jurisdiction's law applies here is controlled by the Federal Tort Claims Act, 28 U.S.C. § 1346(b) *et seq.* (1976) (FTCA or Act). The Act provides that the United States shall be liable "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). To determine what law should be applied in this case, it is necessary first to decide "where the act or omission occurred" and then to apply the "whole law" of that jurisdiction, including the conflicts law, to the facts of the case. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Sami v. United States,* 617 F.2d 755, 761 (D.C.Cir. 1979).

A prerequisite to deciding where the act or omission occurred is determining which was the relevant act or omission. In this case, the district court found the following:

In May and June, 1972, defendant knew, or should have known, that there was a possibility of serious neurologic reaction, including paralysis and death, resulting from DEV pre-exposure prophylaxis. Defendant knew, or should have known: (1) that the probability of contracting rabies unless bitten is low and, (2) that once bitten, the probability of needing a full post-exposure prophylaxis in spite of having taken the pre-exposure series is relatively high, and (3) that the value of any preexposure series was therefore very limited for an individual like Mrs. Hitchcock, who could reasonably have considered herself an individual who had no "unusual risk of repeated exposure" to rabies....

Defendant did not cause a physician to be present at the vaccination of Mrs. Hitchcock and the nurse who was present and who routinely administered the vaccine to Mrs. Hitchcock did so without disclosing to her (1) that vaccination with DEV was not required by the Department or even strongly recommended by the Office of Medical Services, (2) the limited and conditional nature of benefits to be derived from vaccination with DEV, and (3) the incidence of injury and the degree of harm threatened by such vaccination.

Defendant also knew, or should have known, of the necessity for a post-vaccinal test for rabies antibody if the pre-exposure prophylaxis is to have any practical value for a vaccinee. Defendant did not disclose to Mrs. Hitchcock the necessity or existence of such a test. Defendant provided no program for the administration of such a test, nor did Mrs. Hitchcock receive such a test until 1975, in the course of consulting a physician about her demyelinating disease.

479 F.Supp. at 78.

■ Taking into account these findings, and keeping in mind the Supreme Court's holding that Congress intended the applicable law to be that of the jurisdiction where the negligence took place, not where it had its "operative effect," *Richards v. United States,* 369 U.S. 1, 9–10, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962), we believe that the district court was correct in its decision that the relevant "act or omission" occurred in the District of Columbia. That the vaccine was actually administered in Virginia is without significance to this question. As we have seen, the clinic in Virginia at which the vaccine was administered was staffed by only a nurse who was given no instructions about taking medical history, making clear to the patient that the vaccine was voluntary, or giving the patient even a rudimentary notion of the risks and benefits involved with the vaccine. Any negligence arising from these facts certainly cannot be attributed to the nurse. The locus of the

---

**3.** The clearly erroneous standard of review applies to findings of negligence. *McAllister v. United States,* 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); *Daniels v. Hadley Memorial Hospital,* 566 F.2d 749, 756 n.49 (D.C.Cir.1977); *So-cash v. Addison Crane Co.,* 346 F.2d 420 (D.C. Cir.1965) (per curiam). *See generally* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2590 (1971).

negligent acts and omissions is thus established as Washington, D.C.

The second step of this inquiry is to determine what law District of Columbia courts would apply to this case. The District has adopted interest analysis as its choice-of-law principle, a method assessing the contacts of the litigation with the various jurisdictions. *Tramontana v. S.A. Empresa De Viacao Aerao Rio Grandense*, 350 F.2d 468 (D.C.Cir.1965); *McCrossin v. Hicks Chevrolet, Inc.*, 248 A.2d 917, 920–21 (D.C.App.1969). Among the factors to be considered in this analysis are those set forth in the Second Restatement of Conflict of Laws:

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145(2) (1971).

A realistic appraisal of the interests of Virginia and the District in this case requires us to apply District of Columbia law. As we have seen, the plaintiffs' residency in Virginia at the time of the vaccination was fortuitous and short-term; plaintiffs did not have an "enduring relationship" with the state. *Id.*, Comment e. Moreover, although the Government's relationship to Virginia is more substantial, it is no more significant in these circumstances. Under section 1346 of the FTCA the question is whether the government, "if a private person," would be liable under the law of the place where the act occurred. It is thus useful to analogize the Government in this case to a corporation of national scope, headquartered in Washington, with a clinic

under similar circumstances in Virginia. Immediate supervision of the clinic was exercised from Washington. If a judgment were sustained against the corporation, the financial burden would surely fall on the business as a whole, headquartered out-of-state, rather than on the individual clinic. Virginia would thus not have the usual interest in having its law decide the financial responsibility of one of its residents. Washington, correspondingly, would have some interest in having its law applied to decide the liability of a business headquartered there, at least where, as here, the District has other substantial contacts with the litigation. Similarly, because the location of Mrs. Hitchcock's immunization was fortuitous, the "place of injury" consideration in this case is also entitled to less than its normal force in personal injury cases. Had the clinic been anywhere else, the procedures followed would have been the same. Moreover, the procedures were not formulated in Virginia, but in the District. We believe that under these circumstances, while Virginia would retain an interest in applying its law to a situation in which a Virginia resident was injured in Virginia, a District of Columbia court would be likely to subordinate this interest to the more substantial interests of the forum.

The factors underlying the relationship of the District of Columbia to this case seem especially strong. First, this relationship was centered in Washington, D. C.; the primary relationship involved here was the direct one between the Department of State, which was located in Washington, and the plaintiffs. This relationship had existed for twenty-three years when the litigation commenced.[4] Where, as here, the dominant fact of the litigation is the locus of the relationship, we believe that a District of Columbia court would not deny plaintiffs' recovery by applying the Virginia standard of care when another party in the identical relationship with the Department of State could receive the identical vaccina-

---

4. Tr. at 117; J.A. at 212. We emphasize that the connection between the District and the plaintiffs was direct and continuing. Thus, it

was substantially greater than any connection with the District created by the mere fact of federal employment.

tion in an identical clinic in Foggy Bottom using identical procedures and recover under the District of Columbia standard. Moreover, the negligence in this case actually took place in Washington. As was noted in the Second Restatement of Conflict of Laws,

> there is greater likelihood that [the state where the conduct occurred] is to be the state of [the] most significant relationship . . . when the injury occurred in the course of an activity or of a relationship which is centered in the state where the conduct occurred and when the injured person has no settled relationship to the state where the injury occurred.

Restatement (Second) of Conflict of Laws § 146, Comment e (1971). Therefore, despite the superficially persuasive fact that the vaccine was administered in Virginia to a Virginia resident, we believe that in this highly unusual case, in which the acts and omissions complained of took place in Washington, D. C., in which the locus of the relationship between the parties was Washington, D. C., and in which the incidental and temporary residency of the plaintiffs in Virginia was clearly a result of their being called back "to Washington" en route to Buenos Aires, Tr. at 13; J.A. at 108, District of Columbia courts would apply local law on the relevant standard of care.[5]

The Government also contends that, even if local law applies, the district court misapplied that law to the facts of this case. More precisely, it argues that had the State Department provided a reasonably prudent person in Mrs. Hitchcock's position with the type of risk-benefit analysis required by *Canterbury v. Spence*, 464 F.2d 772 (D.C. Cir.1972), *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1973), that reasonably prudent person would have accept-

ed the vaccination.[6] The principal error of the district court, according to the Government, lies in its finding that the Government was negligent in not knowing, and consequently not warning, about the possibility of neurological side effects from pre-exposure vaccination with DEV. *Canterbury*, according to the Government, does not require of a physician the extensive, investigatory inquiry into the possible risks of treatment which the district court required of the Government in this case.

While this point does correctly indicate a possible limitation of the *Canterbury* doctrine,[7] it does not lead to the discovery of any reversible error committed by the district court in this case. In fact, the district court did not require the extensive investigation alleged by the Government. It simply required that the Government act on the information in its possession. Judge Oberdorfer based his finding that a reasonable person in Mrs. Hitchcock's position would have declined the recommended treatment on the following risk-benefit disclosure:

> Taking into account (1) the relatively low probability of exposure to rabies to be reasonably anticipated for a woman of Mrs. Hitchcock's age, position, and prospective residence, (2) the limited protection afforded by DEV pre-exposure prophylaxis, even in conjunction with a subsequent antibody titer, (3) the failure of the Department either to advise plaintiffs of the necessity for a subsequent antibody titer or to provide any procedure to take antibody titers in patients treated with DEV pre-exposure prophylaxis by the Department, and (4) the possibility of severe neurologic reaction, including paralysis and death, as a result of receiving a pre-exposure series of DEV injections, it is established by a preponderance of

---

5. The Government also challenges the application of District law to allow Mr. Hitchcock's consortium claim. For the reasons discussed above, we believe that the application of forum law was proper as to this issue as well.

6. *Canterbury* requires disclosure to the patient of information relating to "the inherent and potential hazards of the proposed treatment, the alternatives to that treatment, if any, and

the results likely if the patient remains untreated." *Canterbury v. Spence*, 464 F.2d 772, 787–88 (D.C.Cir.1972), *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1973).

7. In other words, *Canterbury* does not address the scope of the physician's duty to investigate the risks of treatment.

the evidence that, if the risks and benefits had been disclosed to a reasonable person in Mrs. Hitchcock's position, she would have declined to receive DEV pre-exposure prophylaxis.

479 F.Supp. at 73–74. These four facts that the district court determined would have been material to a reasonably prudent person in Mrs. Hitchcock's position were all known by Dr. Wolfe.[8] (1) Tr. at 500, 511; J.A. at 597, 608; (2) Tr. at 536–37; J.A. at 633–34; (3) Tr. at 532; J.A. at 629; (4) Tr. at 538; J.A. at 635. The fact that Dr. Wolfe would have considered the possibility of neurologic reactions to a pre-exposure dosage to have been so slight as to make it unworthy of mention,[9] does not remove the case from the ambit of *Canterbury*.[10] The district court determined that had a reasonably prudent person in Mrs. Hitchcock's position been aware of this risk and the other listed factors, she would have decided not to accept the recommended treatment. The Government has given this court no reason to believe that the trial court's finding on this point was incorrect.

**8.** As stated above, Dr. Wolfe was in charge of the inoculation program involved in this case in May 1972. Tr. at 496–98; J.A. at 592–94. The division of authority between him and the doctor who was responsible for three immunization clinics including the one in Rosslyn, Tr. at 527; J.A. at 624, is not clear from the record. It is clear, however, that Dr. Wolfe was in a position in which he could have, and should have, acted on his knowledge.

**9.** J.A. at 635. As the district court noted, the only difference between the pre-exposure and the post-exposure vaccine is the "quantity" of vaccine received by the patient. 479 F.Supp. at 68–71. The defendant introduced no convincing evidence that knowledge of the risk of the post-exposure vaccine was irrelevant to the question of the risk of the pre-exposure vaccine. *Id.* at 68–71. The phrasing of Dr. Wolfe's testimony on this point before the district court, *see* pages 5–8 *supra*, suggests that he was aware of the risk. As the district court pointed out, even a very slight risk of serious harm becomes material when the benefits of treatment are as slight as they were in this case. *Id.* at 73–75.

We note further that there is no question as to the applicability of *Canterbury* to the other three material factors that the district court found that the Government failed to disclose.

**10.** As this court stated in *Canterbury*:

## III.

The Government argues finally that liability in this case is precluded by 28 U.S.C. § 2680(a) (1976), the "discretionary function exception" to the FTCA, which states:

> The provisions of this chapter and section 1346(b) of this title shall not apply to—
>
> (a) Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Id.* The Government refers us to *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), for the leading interpretation of this provision. After reviewing *Dalehite*, and a substantial number of its progeny,[11] we believe that, while the matter is not entirely settled,[12] the proper interpretation of the section is clear.

> The scope of the physician's communications to the patient ... must be measured by the patient's need, and that need is the information material to the decision. Thus the test for determining whether a particular peril must be divulged is its materiality to the patient's decision: all risks potentially affecting the decision must be unmasked.

464 F.2d at 786–87 (footnote omitted).

**11.** *See, e.g., Driscoll v. United States*, 525 F.2d 136 (9th Cir. 1975); *Downs v. United States*, 522 F.2d 990, 997–98 (6th Cir. 1975); *Griffin v. United States*, 500 F.2d 1059 (3d Cir. 1974); *Moyer v. Martin Marietta Corp.*, 481 F.2d 585, 594–98 (5th Cir. 1973).

**12.** The holding of *Dalehite* suggests that the exception is to be construed broadly: the failure of the Army to attach suitable labels to bags of fertilizer was held to be discretionary. Some of the language of *Dalehite*, however, seems to limit the exception. The Court stated, for example, that the discretion protected by the exception was "the discretion of the executive or administrator to act according to one's judgment of the best course ...." 346 U.S. at 34, 73 S.Ct. at 967. This test is similar to that adopted by this court in *Sami v. United States*, 617 F.2d 755 (D.C.Cir.1979). *See* the discussion at page 363 *infra*.

Our analysis of this issue is informed by the consideration given to section 2680 by this court in *Sami v. United States*, 617 F.2d 755 (D.C.Cir.1979). The facts of *Sami* defy a brief rendering here. Suffice it to say that the case involved a suit brought by a citizen of Afghanistan and resident of the United States against the Government in connection with "an almost incredible history of marital warfare, with skirmishes occurring up and down the eastern seaboard of this country, as well as abroad." 617 F.2d at 757, *quoting Sami v. Sami*, 29 Md. App. 161, 163–64, 347 A.2d 888, 890 (1975). As we noted in *Sami*, there are "persistent themes" in the multitude of cases applying section 2680—among them, "holding the government responsible for any negligent execution of admittedly discretionary policy judgments where the decisions required for the execution did not themselves involve the balancing of public policy factors." 617 F.2d at 766. *See Blessing v. United States*, 447 F.Supp. 1160 (E.D.Pa.1978). The court then quoted *Blessing's* conclusion that the policy of the exception was to " 'prevent[] tort actions from becoming a vehicle for judicial interference with decisionmaking that is properly exercised by other branches of government,' " and that the exception applies only where " 'the question is not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency. Tort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions.' " 617 F.2d at 766–67, *quoting* 447 F.Supp. at 1170. The test that the *Sami* court finally applied to the conduct in question was "whether the acts for which liability is here claimed were so fraught with foreign relations or other public policy considerations as to render them 'discretionary' within the meaning of the FTCA...." 617 F.2d at 767.

Applying this test to the facts before us, we conclude that the acts and omissions found actionable in this case were not "so fraught with ... public policy considerations" as to render them discretionary within the meaning of the Act. The testimony at trial suggests that there was little or no public policy involved in the State Department's failure to ensure that the vaccine program be administered in a manner designed to inform Mrs. Hitchcock that the vaccine was recommended, not required, and to allow her to decide whether to accept the treatment on the basis of her weighing of the risks and benefits involved. This is not a case in which it was demonstrated that the decision not to disclose the risks and benefits of treatment to each patient was made for a public health-related reason, such as the necessity of inoculating a large number of persons in a short time, coupled with the reasonable belief that disclosure would frustrate this goal. In a situation of that type, the policy-related nature of the decision would present a different question and possibly a different result. Here, however, the record is devoid of support for such a rationale.[13] It appears more likely from the record that the reason no effective disclosure—even of the nonrequired nature of the treatment—was made was that those responsible for the implementation of the policy did not believe that the circumstances warranted informing the patients about their purported choice of treatment. The necessity of such disclosure is a settled matter, however, under *Canterbury v. Spence*. We read section 2680 and *Dalehite* and its progeny to establish the

---

13. Dr. Wolfe's bare assertion of the infeasibility of warning patients of the risks of treatment or taking their medical histories does not establish a policy basis for the Government's negligence in this case. First, the Government did not even assert infeasibility as to certain of the negligent acts or omissions, *e.g.*, the failure to make clear to Mrs. Hitchcock that the treatment was merely recommended. Second, there was no evidence of infeasibility presented; to allow a mere recital of infeasibility to bar government liability would be to enlarge the exception to the point at which it could swallow the rule.

It is useful to note in this connection record evidence that the Peace Corps, in May 1972, elicited some medical history and made some efforts at warning potential DEV recipients of risks and benefits. Tr. at 459–60, 475–76, 479; J.A. at 555–56, 571–72, 575.

rule that, where the government acts negligently for reasons unrelated to public policy considerations, it is liable to those it injures. Because we cannot find clearly erroneous the district court's decision that the Government acted negligently in this case, and that its negligence caused Mrs. Hitchcock's injury, the judgment of the district court is

*Affirmed.*