Norman RAFLO, et al., Plaintiffs,

v.

UNITED STATES of America,
et al., Defendants.

No. CIV. A. 97–1918CKK.

United States District Court,
District of Columbia.

Feb. 13, 2001.

3

Rodney Sweetland, III, Arlington, VA, for Plaintiff.

Scott Harris, Mary Lou Leary, U.S. Attorney' Office, Washington, D.C., Paul Thomas Cuzmanes, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Baltimore, MD, Catherine Hanrahan, Carr Goodson P.C., Washington, D.C., for Defendants.

## MEMORANDUM OPINION

KOLLAR-KOTELLY, District Judge.

This case, brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), arose from a series of allegedly negligent medical decisions that ultimately led to the death of Plaintiff Allyn Raflo. Pending

before the Court are Defendant United States' Motion to Apply Virginia Law. Defendant PHP Health Care Corporation's Joinder of the United States' Motion to Apply Virginia Law, Plaintiffs' Opposition thereto, and Defendant United States' Reply in Support of Motion to Apply Virginia Law. For the reasons stated below, the Court denies Defendant United States' and Defendant PHP's Motion to Apply Virginia Law.

## I. BACKGROUND

Plaintiff Norman Raflo is a retired U.S. Army serviceman residing in the Commonwealth of Virginia. *See* Amended Compl. ("Comp.") at ¶ 11. Plaintiff appears on his own behalf, and as personal representative of the Estate of Allyn Raflo. Norman Raflo's deceased wife. *See id.*

On or about August 27, 1996, Allyn Raflo, went to a primary care facility known as the Burke PRIMUS in Burke, Virginia.[1] *See* Compl. ¶ 13. Mrs. Raflo complained of abdominal pain, nausea, and a mild fever. *See id.* Without conducting any laboratory work, her treating physician prescribed a smooth muscle relaxer and sent her home. *See id.* However, because these symptoms continued and grew more acute, the following day, Mrs. Raflo went to the emergency room at the DeWitt Army Community Hospital at Ft. Belvoir, Virginia. *See id.* ¶ 14. Laboratory tests revealed that she had abnormal levels of monocytes. *See id.* On August 31, 1996, Mrs. Raflo returned to the Burke PRIMUS facility because she was exhibiting the following symptoms: orange urine, nausea, abdominal cramps, vomiting, fever, cough with whitish-yellow sputum, and runny nose. *See id.* ¶ 15. Kiran Patel, M.D., a former defendant in this case, allegedly diagnosed Mrs. Raflo's ailment

as bronchitis. *See id.* ¶ 16. Subsequently, on or about September 1, 1996, Mrs. Raflo was taken to the emergency room at the DeWitt Army Community Hospital and was diagnosed with thrombotic thrombocytopenic purpura ("TTP") and/or hemolytic uremic syndrome ("HUS"). *See id.* ¶ 17. On that day, Mrs. Raflo was transferred to Walter Reed Medical Center ("Walter Reed") in the District of Columbia, where she began treatment for TTP/HUS, including plasma pheresis and kidney dialysis. *See id.* ¶ 18. Mrs. Raflo continued to receive treatment for TTP/HUS until September 7, 1996, when she allegedly suffered a subdural hemorrhage and cerebellar herniation. *See id.* ¶ 19–20. She died on September 8, 1996 at Walter Reed. *See id.* ¶ 22.

Plaintiffs, Norman Raflo and the Estate of Allyn Raflo, filed a five-count action on August 22, 1997, which was amended to add a sixth-count on February 18, 2000, against the United States and PHP Health Care Corporation (hereinafter "PHP"). PHP is incorporated in Delaware but conducts business in the District of Columbia and Virginia. Plaintiffs' Complaint alleges that Defendants committed a series of negligent actions in failing to properly diagnose the medical condition of Mrs. Raflo. In this motion, Defendants United States and PHP ask the Court to rule that Virginia law applies to this action.

## II. DISCUSSION

### A. As to Defendant PHP, District of Columbia Substantive Law Applies

■■■ In diversity cases, a federal court must follow the choice of law rules of the forum state in which it is sitting to determine which state's law to apply. *See*

---

1. The facility is one of the many through which the United States fulfills its statutory

obligation to provide medical care to retired soldiers.

*Klaxon Co. v. Stentor Electric Mfg. Co., Inc.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Day & Zimmermann,* 423 U.S. 3, 4, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Ideal Electronic Co. v. International Fidelity Insurance Co.,* 129 F.3d 143, 148 (D.C.Cir.1997). Accordingly, in exercising diversity jurisdiction over Defendant PHP, this Court must apply District of Columbia choice of law rules. District of Columbia choice of law rules dictate that the District's substantive law should govern Plaintiffs' case against PHP.

 In determining which state's substantive law to apply to a tort case, the District of Columbia's choice of law rules require this Court to use the "governmental interests" analysis approach. *See Kaiser–Georgetown Community v. Stutsman,* 491 A.2d 502, 509 (D.C.1985) (hereinafter *Stutsman I* ); *Hercules & Co. v. Shama Restaurant,* 566 A.2d 31, 40–41 (D.C.1989). This approach adheres to a two-step inquiry: 1) identifying the governmental policies underlying the applicable laws; and 2) determining which state's policy would be most advanced by having its law applied to the facts of this case. *See Stutsman v. Kaiser Foundation Health Plan of the Mid–Atlantic States, Inc.,* 546 A.2d 367, 373 (D.C.1988) (hereinafter *Stutsman II* ); *Williams v. Williams,* 390 A.2d 4, 6 (D.C. 1978). To evaluate which state has the stronger interest, the four factors enumerated in the Restatement (Second) of Conflict of Laws § 145 are also considered: 1) the place where the injury occurred; 2) the place where the conduct causing the injury occurred; 3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and 4) the place where the relationship is centered. *See Hercules,* 566 A.2d at 40–41.

 When the policy of "State A" would be advanced by application of its own State A law, and the policy of the other state, "State B," would not be advanced by application of State B's law, a so-called "false conflict" appears and the law of the interested state, State A, prevails. *See Stutsman I,* 491 A.2d at 509. In contrast, when both states have a genuine interest in applying their own laws, a "true conflict" exists and the court must weigh the competing interests in order to determine which state has the stronger interest. *See Biscoe v. Arlington County,* 738 F.2d 1352, 1360 (D.C.Cir.1984) (holding that where a true conflict exists, "the law of the jurisdiction with the stronger interest will apply"); *District of Columbia v. Coleman,* 667 A.2d 811, 816 (D.C.1995) (Where a true conflict exists, "the forum law will be applied unless the foreign [state] has a greater interest in the controversy."). An analysis of the competing interests held by the District of Columbia and Virginia in applying their own laws and in furthering their separate public policies in this case reveals no real conflict.

 Defendant PHP argues that Virginia's governmental interest is more significant than the District's interest, given that the Virginia legislature has capped the amount of damages recoverable in medical malpractice cases like the one before this Court. Virginia has undoubtedly expressed a public policy interest in limiting the liability of health care providers operating within the state. *See* Virginia Medical Malpractice Act, 2 VA. CODE ANN. §§ 8.01–581.1 to 8.01–581.20 (Michie Supp. 1984) (hereinafter the "Act"). The Act modifies the law of negligence in malpractice cases in Virginia by creating a mediation process, *see* 2 VA. CODE ANN. §§ 8.01–581.2, and limiting the amount of recovery permitted against health care providers in malpractice actions, *see* 2 VA. CODE ANN. §§ 8.01–581.15. The Act was passed with two intended goals: 1) to lower the high

**6**

cost of medical malpractice insurance which the legislature believed was responsible for driving health care providers from the profession, and 2) to ensure that the residents of Virginia benefitted from adequate health care that is both available and affordable. *See Lewis v. Group Health Association, Inc.,* 1992 WL 25877, *3 (D.D.C.1992); *Etheridge v. Medical Center Hospitals,* 237 Va. 87, 376 S.E.2d 525, 527–28 (1989).[2]

However, Virginia's interest in protecting its health care providers and its residents are substantially reduced in this particular case. First, Virginia's interest in the application of its statute becomes attenuated when its intended beneficiary is a foreign corporation with its principal places of business outside Virginia. *See Stutsman I,* 491 A.2d at 511. Here, Defendant PHP is a national health care corporation, incorporated in Delaware. *See* Plaintiff's Opposition to the Government's Motion to Apply Virginia Law ("Pl.Opp."), Ex. 7. Although PHP conducts business in Virginia, Virginia is only one of 26 states in which PHP operates. *See id.* Therefore, the weight of any financial impact upon PHP which results from a finding of liability in excess of the statutory cap will be spread among the various states in which PHP operates, and will not fall solely, nor even primarily, upon the care PHP pro-

vides in Virginia. *See Stutsman I,* 491 A.2d at 511.

In addition, Virginia's interest in ensuring that its residents can obtain adequate and affordable health care is not contravened by application of District of Columbia law in this case. When passing the Act, the Virginia legislature concluded that, without the cap, Virginia health care providers could not be expected to continue providing medical care for its citizens, given the increase in medical malpractice claims, which the Virginia legislature viewed as directly affecting the premium cost for and the availability of medical malpractice insurance. *See Etheridge,* 376 S.E.2d at 527. Here, however, PHP, through its contract with the United States, which has a statutory obligation to provide health care coverage to retired soldiers and their families, must continue to provide adequate medical care to such covered Virginia residents, irrespective of increasing costs. In other words, Virginia residents who are retired soldiers or their families, like the Plaintiffs in this case, will continue to enjoy health care coverage even if their health care provider, the United States and its contractors, do not enjoy the benefit of the Virginia Medical Malpractice Act's cap on their malpractice liability.

Furthermore, while application of District of Columbia law in this case will not

---

**2.** The courts disagree as to which of the two intended goals was primary in the passage of the Act. In *Stutsman I,* the D.C. Court of Appeals stated:

[the Act was] enacted with the *primary* purpose of protecting Virginia *health care providers* from excessive liability... Virginia residents may be benefitted incidentally by the Act in that the cost of medical malpractice insurance passed on to them through medical fees will be less than it would have been had the statute not been enacted. Nonetheless, the primary purpose of the Act is to protect Virginia health care providers

from claimants who seek to recover damages in excess of the amount the Virginia legislature has deemed to be acceptable. 491 A.2d at 510–11 (emphasis added). In contrast, a federal district court in the District of Columbia found that, "[b]y reducing costs [of medical malpractice insurance premiums], the [Virginia] legislature sought to benefit not just the health care providers of the state, but *primarily* the *residents,* by insuring that adequate health care remained both available and affordable." *Packer v. Kaiser Foundation Health Plan,* 728 F.Supp. 8, 10 (D.D.C.1989) (emphasis added).

contravene Virginia's public policy, application of the Virginia's cap will contravene the District's interest "in holding its corporations liable for the full extent of the negligence attributable to them." *See Stutsman I*, 491 A.2d at 509–10. *See id.* Whether or not PHP's principal place of business is in the District, it is undeniable that PHP has an extensive operation here in the District. For example, on October 31, 1997, PHP had accounts receivable from the District amounting to $13.5 million. *See* Pl. Opp., Ex.9. Unlike Virginia, the District imposes no cap on liability for malpractice. *See id.* The District's public policy interest to hold negligent corporations fully liable would be seriously undermined in this particular case, if this Court were to allow PHP, a corporation conducting substantial business in the District, to benefit from the Virginia's cap which is designed to protect Virginia's corporations.

Defendant PHP also points out that the *Stutsman I* court relied on another significant District of Columbia interest-the District of Columbia's interest "in protecting a member of its work force." *Packer v. Kaiser Foundation Health Plan*, 728 F.Supp. 8, 11 (D.D.C.1989); *Stutsman I*, 491 A.2d at 510. Admittedly, unlike the plaintiffs in *Stutsman I*, Plaintiffs in this case were not employed in the District and the relationship between Defendant PHP and Plaintiffs did not arise out of such District of Columbia employment. *Comp. Stutsman I*, 491 A.2d at 507–08 (finding that the District had a significant interest where plaintiff was employed within the District and the agreement to provide health care was a benefit of the plaintiff's District employment). However, Plaintiffs here were also not employed in Virginia nor did they obtain their health insurance in Virginia through a Virginia employer. *Comp. Packer*, 728 F.Supp. at 11 ("[T]he District of Columbia's interest is substantially reduced, because [plaintiff] was em-

ployed in Virginia and obtained her . . . health coverage through that Virginia employer."). The evaluation of the District of Columbia's interest in protecting its workforce renders this particular case unique in that Plaintiff did not obtain her health coverage through her employment. Instead, she received federally provided health care coverage based upon her husband's military service. Given the fact that this second interest in protecting one's workforce favors neither the District nor Virginia, the District's interest in holding negligent corporations fully liable appears to ˌoutweigh Virginia's interests which, as discussed above, are significantly reduced in this case. Accordingly, the Court concludes that the District of Columbia has a substantial interest in this litigation and that Virginia's public policy is not contravened by the application of District of Columbia law to this action against PHP. Therefore, the Court shall apply, with regard to Plaintiffs' claims against PHP, District of Columbia law.

**B. As to Defendant United States, District of Columbia Substantive Law Also Applies**

Unlike diversity cases, the Federal Tort Claims Act (hereinafter the "FTCA") poses an even more difficult conflict of law analysis to determine which state's substantive law governs the particular FTCA case. For example, in diversity cases, although the process of determining which substantive law to apply may become complicated, at the very least it is almost always certain which state's choice of law provision should apply-the choice of law provision of the forum state in which the court is sitting. However, in FTCA cases, it is not even clear which state's choice of law provision should apply. The process of determining which state's choice of law provision to apply may become as or more

complex than determining which state's substantive law to apply.

The FTCA specifies that FTCA claims must be determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b) (1982). The Supreme Court has interpreted this language to mean that in multistate FTCA actions, courts must apply the "whole" law of the state where the negligent or wrongful acts occurred. *See Richards v. United States*, 369 U.S. 1, 6–7, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). *Richards* teaches that the "whole" law includes choice of law rules. *See id.* Therefore, in exercising jurisdiction over Defendant United States under the FTCA, this Court must apply the choice of law provision belonging to "the place where the act of omission occurred." However, the instant case is further complicated by the fact that multiple acts or omissions are alleged to have occurred in two different jurisdictions, the District of Columbia and Virginia. Unfortunately, *Richards* does not address this particular problem of determining which state's choice of law provision to apply in cases involving multiple acts or omissions occurring in different states. *See Spring v. United States*, 833 F.Supp. 575, 576 (E.D.Va.1993).

Recently, the Third Circuit Court of Appeals provided some guidance for analyzing cases where multiple acts or omissions occur in more than one state. *See Gould Electronics Inc. v. United States*, 220 F.3d 169, 180 (3d Cir.2000). The *Gould* court reasoned that a two-step conflict of laws analysis should apply. *See id.* In the first step, the court must select between the states' respective choice of law provisions. *See id.* (citing *Richards*, 369 U.S. at 11, 82 S.Ct. 585; *Ducey v. United States*, 713 F.2d 504, 509 n. 2 (9th Cir.1983); *Bowen v. United States*, 570 F.2d 1311, 1318 (7th Cir.1978)). In the second step, the court must apply that state's choice of law provision to determine which state's substantive tort law applies. *See Gould Electronics Inc.*, 220 F.3d at 180 (citing *Richards*, 369 U.S. at 11, 82 S.Ct. 585; *Tyminski v. United States*, 481 F.2d 257, 265 (3d Cir. 1973)).

■ However, before proceeding to the two-step conflict of law analysis, initially, the court must determine whether the perceived conflict between the underlying choice of law rules or between the underlying substantive laws is, in fact, a "true conflict." *See Gould Electronics Inc.*, 220 F.3d at 180. If no "true conflict" exists, the complex two-step conflict of laws analysis described in *Gould* is unnecessary. *See id.* In the instant case, a "true conflict" exists. There is a true conflict between the choice of law provision applicable in the District of Columbia and the provision which is applicable in Virginia: the District employs a governmental interest analysis, while Virginia applies the *lex loci delicti* approach. In addition, the substantive tort law of medical malpractice also appears to conflict as the District allows full compensation, while Virginia imposes a cap on liability. These differences necessitate the two-step conflict of laws analysis discussed in *Gould*.

## 1. Step 1: Selection of Choice of Law under FTCA.

■ Because multiple acts or omissions are alleged to have occurred in the District and Virginia, this Court must elect between District of Columbia and Virginia choice of law provisions. The FTCA, as interpreted by *Richards*, requires this Court to select the choice of law provision belonging to the state where the "acts or omissions" occurred, not where the injury occurred. *See* 28 U.S.C. § 1346(b)(1) (United States liable "in accordance with

the law of the place where the act or omission occurred."); *Richards*, 369 U.S. at 11–13, 82 S.Ct. 585. However, neither the text of the FTCA, nor the legislative history of the FTCA, nor *Richards* provides any guidance on how to choose between conflicting choice of law provisions when the alleged acts or omissions occur in more than one state. *See Gould Electronics Inc.*, 220 F.3d at 181. Moreover, not only is there a dearth of case law among the various lower courts addressing this problem, where the courts have actually spoken, there is disagreement regarding how to determine the applicable choice of law provision resulting in the adoption of no less than five different approaches.[3] *See id.* Despite this disagreement, the approach taken by the U.S. Court of Appeals for the District of Columbia Circuit clearly controls the analysis in this Court.

The D.C. Circuit applies the choice of law rules of the place where the "relevant" act or omission occurred. *See Hitchcock v. United States*, 665 F.2d 354, 359 (D.C.Cir. 1981). In *Hitchcock*, the plaintiff was injured by a vaccine administered by a government nurse in Virginia, but the court applied District of Columbia choice of law rules because the court concluded that the "relevant" acts occurred in the District. *See id.* The court reached this conclusion, reasoning that the failure by the nurse to warn the plaintiff of the risks of the vaccine was due to low supervision and direction, which was ultimately attributable to the failure of government officials in the

District to properly develop the protocol for the administration of the vaccine. *See id.*

In this case, the relevant acts and/or omissions occurred in Virginia. Plaintiffs argue that because the United States of America, whose seat of government is located in the District of Columbia, is the named defendant in this case, the District of Columbia's choice of law provisions should apply. *See* Pl. Opp. at 8. In contrast, Defendant United States argues that the primary government actor in this case is the U.S. Army Medical Department (AMEDD), which has headquarters in Virginia and Texas. *See* Defendant United States' Reply in Support of Motion to Apply Virginia Law ("Def.Reply") at 8. This Court agrees with Defendant that, for the purposes of determining the relevant acts or omissions in this case, the Court will look to the alleged acts and/or omissions of the U.S. Army Medical Department. In *Hitchcock*, in reaching its conclusion that the relevant acts and omissions took place in the District of Columbia, the district court treated the Department of State, rather than the United States of America, as the primary government actor. 665 F.2d at 360. Similarly, this Court finds that the relevant acts and/or omissions of alleged negligent implementation and maintenance of adequate procedures and alleged negligent hiring, training and supervision of the physicians and staff, were performed by the United States Army offi-

3. One court applied the choice of law provision on an act-by-act basis, applying the relevant state's choice of law provision for each act or omission. *See Kohn v. United States*, 591 F.Supp. 568, 572 (E.D.N.Y.1984). The Seventh Circuit Court of Appeals outlined two separate approaches to elect the choice of law provision of "the place of the last act of omission having a causal effect" *or* "the place of the act or omission having the most significant causal effect." *See Bowen v. United*

*States*, 570 F.2d 1311, 1318 (7th Cir.1978). The Ninth Circuit Court of Appeals selected the choice of law provision of the state in which "physical acts" could have prevented the injury. *See Ducey*, 713 F.2d at 509 n. 2. Finally, the Third Circuit Court of Appeals applied all the various approaches to the particular facts of the case in determining which state's choice of law provision to apply. *See Gould Electronics Inc.*, 220 F.3d at 181–83.

cials. These officials are or were located in Virginia. Moreover, some of the other significant acts or omissions made by Defendant United States occurred in Virginia. For example, acts of alleged negligent failure of Defendant United States' agents, servants, and/or employees at the DeWitt Army Hospital and Burke PRIMUS to properly diagnose TTP/HUS in a timely manner occurred in Virginia. *See* Compl. ¶ 33.

Admittedly, some of the relevant acts and/or omissions by Defendant United States, such as the alleged negligent treatment of TTP/HUS, occurred in Walter Reed Army Medical Center in the District of Columbia. *See* Compl. ¶ 33. However, given that there is no clear guidance articulated by *Hitchcock* regarding the proper standard to follow when relevant acts or omissions occur in more than one jurisdiction, it seems prudent to elect the choice of law provision belonging to the place where the most substantial portion of the acts or omissions occurred. In this case, a greater portion of the allegedly negligent acts and/or omissions occurred in Virginia than occurred in the District of Columbia. Thus, it follows that Virginia choice of law rules should apply.

### 2. Step 2: Application of Virginia Choice of Law Rules

■■■■■ In determining which state's substantive law to apply in a multistate tort action, Virginia choice of law rules require this Court to follow the *lex loct delicti* principle under which the substantive rights of the parties are governed by the law of the place of the wrong. *See McMillan v. McMillan*, 219 Va. 1127, 253 S.E.2d 662, 663 (1979); *Jones v. R.S. Jones and Assoc., Inc.*, 246 Va. 3, 431 S.E.2d 33, 34 (1993). The place of the wrong for purposes of the *lex loci delicti* rule is defined as the place where "the last event

necessary to make an act liable for an alleged tort takes place." *See Quillen v. International Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir.1986). In a personal injury case, an act becomes liable when the injury is sustained. *See id.* (citing VA. CODE ANN. § 8.01–230 (Michie 1984)).

■■■■■ Therefore, to determine the place of wrong and ultimately which state's substantive law governs this case, this Court must first identify the actionable injury. "Injury" means "a positive, physical or mental hurt." *See St. George v. Pariser*, 253 Va. 329, 484 S.E.2d 888, 890 (1997). An injury need not occur contemporaneously with the negligent act, but may arise at some later point. *See id.* Finally, an injury is deemed to occur whenever any injury, however slight, is caused by the negligent act, even though additional, more severe injury or damage may be subsequently sustained as a result of the negligent act. *See id.* Defendant United States argues that the place of injury is Virginia where the alleged misdiagnosis occurred. *See* Def. Reply at 5. Plaintiffs argue that the place of injury is the District of Columbia where Plaintiff suffered for six days before she died. *See* Pl. Opp. at 4.

■■■■■ In a misdiagnosis case as this, the actionable injury is the condition caused by improper treatment rendered because of the misdiagnosis. *See St. George*, 484 S.E.2d at 891 (citing *Renner v. Stafford*, 245 Va. 351, 429 S.E.2d 218 (1993)). In every misdiagnosis case, the patient has some type of medical problem at the time the physician is consulted. *See St. George*, 484 S.E.2d at 891. But the injury upon which the cause of action is based is not the original detrimental condition; it is the injury which later occurs because of the misdiagnosis and failure to treat. *See id.* For example, in *Jenkins v. Payne*, 251 Va. 122, 465 S.E.2d 795 (1996),

the injury was the wrongful death of a patient who, when presented to the physician with a cancerous condition, was not diagnosed or treated before the condition became terminal. *See St. George*, 484 S.E.2d at 891. Similarly, in this case, the injury is the wrongful death of Mrs. Raflo who, when presented to the physicians at the Burke PRIMUS and the DeWitt Army Hospital with a condition of TTP/HUS, was neither diagnosed nor treated before the condition became fatal. Therefore, the actionable injury occurred in the District of Columbia. Thus, the Court finds that, with regard to Plaintiffs' claims against the United States, District of Columbia substantive law will apply.

### III. CONCLUSION

For the foregoing reasons, the Court finds that District of Columbia law shall apply to both Defendant PHP and Defendant United States. Accordingly, the Court shall deny Defendant United States' and Defendant PHP's Motion to Apply Virginia Law. An appropriate Order accompanies this Memorandum Opinion.

### ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is, this 13 day of February, 2001, hereby

**ORDERED** that Defendant United States' Motion to Apply Virginia Law (# 72), as joined by Defendant PHP Health Care Corp., is DENIED; and it is further

**ORDERED** that District of Columbia substantive law shall apply to all of Plaintiffs' claims against Defendants United States and PHP Health Care Corp.

**SO ORDERED.**